707 A.2d 1053

THOMAS J. FIORINO AND EILEEN M. FIORINO, PLAINTIFFS–RESPONDENTS, v. SEARS ROEBUCK AND COMPANY, INC., AND EMERSON ELECTRIC COMPANY, INC., DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued February 10, 1998—Decided March 19, 1998.

558

Before Judges DREIER, KEEFE and WECKER.

*Joseph DiRienzo, Sr.* and *Joseph DiRienzo, Jr.,* argued the cause for appellants (*DiRienzo & Wallerstein,* attorneys; *Messrs. DiRienzo,* on the brief).

*Benjamin Luke Serra,* argued the cause for respondents.

The opinion of the court was delivered by

DREIER, P.J.A.D.

Defendants, Sears Roebuck & Company, the seller, and Emerson Electric Company, Inc., the manufacturer, appeal from a product liability judgment in favor of plaintiff, Thomas J. Fiorino, in the amount of $100,000, and his wife, Eileen M. Fiorino, for her *per quod* claim in the amount of $25,000. Plaintiff was injured when a Craftsman shredder-bagger, used to shred, bag or blow leaves, pivoted vertically towards plaintiff as he was attempting to start it, severely injuring his nose.

Plaintiff purchased the Craftsman combination leaf blower and shredder-bagger from Sears in 1988 and used it for approximately four years. He testified that it had been maintained properly and went through a pre-season servicing each year with the oil changed, the spark plug checked, a new supply of gasoline and a test start. There had been no significant problems starting the engine in the four years of use, and plaintiff, who was seventy years old at the time of the accident, claimed that he cleared his yard with the machine approximately three times per week. He

was careful when he started the engine to roll the machine out of his garage and put it in an open, clear grass area to be certain that there was no debris or anything that would cause the machine to malfunction. He appeared familiar with the operator's manual.

The machine could be used in one of two modes. The shredder-bagger mode required an attachment so that the machine would operate similar to a vacuum cleaner and would direct the leaves into a bag that would be attached by a metal rod to the handle. At times, however, the machine was used as a leaf blower, in which case a chute was attached that bent downward and no bag was needed. It was in this latter mode that plaintiff operated the machine on the date in question.

In starting the machine, plaintiff followed the directions in the operator's manual. He stood in front of the machine, facing towards its rear, with his right foot on top of the scroll housing, and with his right hand grasping the starter handle attached to the exposed end of the starter rope or cord. An illustration in the instruction manual depicts an operator in such a stance with the starter handle being pulled at approximately a forty-five degree angle towards the operator.

When plaintiff pulled the handle with the usual force necessary to start the engine, the cord extended only about six to eight inches and then locked. The wheels slid back (away from plaintiff), and, plaintiff testified that as he pulled, "[a portion of the] machine ... came up, the wheels went back, and the handle struck [him]." The judge then described what the witness had been demonstrating, stating "[l]et the record show the witness was facing the front of the machine with his right foot on the housing, with the pull cord on the right side at the top of the engine, and with the handle, the farthest extremity from him, indicating that the machine rotated with the front going under and the handle coming over the top of the rotation."

The handle struck plaintiff on the nose, badly fracturing it and causing significant injuries, described in detail in the record. Plaintiff further testified that on two other occasions the starter

cord stuck when pulled out about fourteen inches and stopped, but the machine started briefly before the engine stopped. On each of such occasions, however, the machine started properly on the second pull.

Both plaintiff's and defendants' experts agreed that the power needed to start the machine was twenty-five to thirty pounds of force if the machine was properly tuned. The machine itself weighed eighty-four pounds. Plaintiff's expert tested the force needed to pull the machine over by locking the cord in the approximate position described by plaintiff and then measuring the force necessary to tip the shredder-bagger without the machine's front wheels rolling backwards. Defendants' expert acknowledged that, in pulling on the starter cord, plaintiff could have pulled it with a seventy-five pound force. Of course, if twenty-five to thirty pounds of this force were used as intended to turn over the engine, the force on the machine would have been less than the sixty pounds needed to tip it. If, however, the cord unexpectedly stuck as it was being pulled, the full force of the pull would be exerted to provide torque, tilting the machine and forcing the handle towards the operator. Thus, plaintiff amply demonstrated how the accident occurred.

## I.

Defendants in their brief and at oral argument before us challenged the test performed by plaintiff's expert for a variety of reasons. They contend that the test conditions did not duplicate the accident as testified to by plaintiff. First, they contend the wheels did not roll, and, second, that the jamming of the starter cord in the position testified to by plaintiff was not the same as pulling the cord to that position. The jury, however, was free to determine whether there had been an adequate duplication of the accident to provide the data relied upon by plaintiff's expert. We note that defendants' expert did not challenge the test on this basis. Furthermore, elemental logic suggests that the test without the wheels moving would require a greater force on the cord

than if both the pull on the cord and forward pressure from plaintiff's foot, contributed to the pivoting motion of the bagger-shredder around the machine's center of gravity. If the wheels did not move, then the only contribution that plaintiff's foot pressure would have made would be the downward force holding the wheels steady on the ground. Instead of pivoting around the machine's center of gravity, the pivot points would be the front wheels. The motion of the wheels indicated only that the forward pressure of plaintiff's foot had decreased the amount of force necessary to be placed on the cord to cause the machine to pivot towards plaintiff.

## II.

■ Plaintiff's expert suggested an alternative design which he contended was economically and physically feasible, namely rotating the starter mechanism ninety degrees counterclockwise.[1] Under plaintiff's expert's design, the mechanism would be placed so that an operator would start the machine by pulling the cord towards the side rather than the front. Defendants contended that this alternative was less stable and that it had not been tested. Again, however, we may apply logic to this alternative design. As redesigned by plaintiff, the pull of the cord is perpendicular to the direction of the wheels, so there can be no rolling. The push of the operator's foot against the housing, which caused the closest wheels to pivot away and added to the force tending to tilt the machine to tilt towards the operator, cannot contribute to the torque with the redesigned handle. This, in itself, is an improvement. Of course, with this design, if the machine were tilted, the handle would pass to the right of the operator and not strike the operator's face. But, say defendants, the machine has multiple functions, and when the leaf bag is attached to the handle by a metal pole, the bag and handle will move towards the

---

[1] As we later note, a rotation clockwise, with the machine further redesigned so that the exhaust and bagger attachment would be on the other side of the machine, might further improve its safety.

operator's face in the same manner as the handle did when the machine was started from the front.

Unfortunately, the record does not reveal that the plaintiff's expert demonstrated to the jury how the machine would start from the side.[2] But the alternative design suggested by plaintiff's expert prevents the rolling of the closest wheels away from the operator as a result of the foot pressure, and this was properly before the jury. There would be a lessened chance of tipping, even if the bagger attachment would present a danger to the operator similar to the handle in the original design. On this basis, the jury could well have determined that plaintiff had demonstrated a reasonable alternative design, required by the risk/utility cases. *See Cepeda v. Cumberland Eng'g Co., Inc.,* 76 *N.J.* 152, 174, 386 *A.2d* 816 (1978); *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 168–70, 406 *A.2d* 140 (1979), and their progeny. The design also would apparently have satisfied the *Restatement (Third) of Torts: Products Liability* § 2(b). *See Green v. General Motors Corp.,* —— *N.J.Super.* ——, ——, —— *A.2d* ——, ——, 1998 WL 116851 (App.Div.1998) (slip op. at 11), and the cases there cited.

There is no question that the reasonable alternative design must be proposed with all of the intended or reasonably anticipated uses of the machine in mind, *see Restatement, supra,* comment on § 2(b), and certainly the use of the machine with the bagging attachment must have been one of them. On remand, plaintiff's expert can reassess the various options and perhaps explain them

---

[2] If, as we suggest, the starting mechanism were rotated clockwise by ninety degrees, and the machine were constructed with the bagger and exhaust to the right, the handle would be adjacent to the operator's free left hand as the cord is being pulled. We can only surmise, and assume that on remand for other reasons for a retrial our assumption will be either validated or disproven, that the operator's left hand could easily hold the handle and thus prevent any tipping of the machine. This, as was pointed out by defendant at oral argument, is impossible when the machine is started from the front, since the handle is too far away. Although this design might be better than that of plaintiff's expert, the jury obviously found the expert's to be better than defendant's design, and this is all that the law requires.

more clearly to the jury. It is apparent, however, that the jury considered the options presented and may well have found plaintiff's alternative to be reasonable, making it less likely that plaintiff would have been injured, without impeding the reasonably anticipated uses of the machine.

### III.

We have stated that the jury may well have made this determination, but considering the charge that the jury was given, we cannot be sure. Because of this we are constrained to reverse this verdict. In his charge, the judge instructed the jury about the risk/utility analysis by which "a design defect may also be established by proof that the risks or dangers of using a product outweigh its usefulness and therefore a reasonably careful manufacturer or a reasonably careful supplier/seller would not have sold the product at all in the form that it was sold...." From the time the risk/utility analysis was first stated by the Supreme Court in *Cepeda v. Cumberland Eng'g Co., Inc., supra,* trial judges were instructed that it is "not always ... appropriate for the court to include in the instructions to the jury all seven of the [risk/utility] factors," and that the trial court should call to the attention of the jurors "for their consideration" only those factors in the "risk/utility analysis for which there is specific proof in the case and especial significance." 76 *N.J.* at 174–75, 386 *A.*2d 816. *See also Navarro v. George Koch & Sons, Inc.,* 211 *N.J.Super.* 558, 578–79, 512 *A.*2d 507 (App.Div.), *certif. denied,* 107 *N.J.* 48, 526 *A.*2d 138 (1986).

The seven risk/utility factors stated in *Cepeda* are:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.[3]

Even if the traditional risk/utility charge were to have been given, and the first six factors applied, the seventh factor should almost never be charged to the jury. In fact, Model Civil Jury Charge No. 5.34B notes the factor as one which "should almost always be omitted." Nothing in this case warrants an exception. The judge here, however, specifically charged the jury that one of its considerations in assessing the reasonableness of the manufacturer's design could be

[T]he feasibility on the part of the defendants of spreading the loss and setting the price of the product or carrying liability insurance.

Thus, a jury that carefully listened to the judge's charge could have determined that defendants should be held liable because they had the ability to spread the loss for injuries among all the users of the product by setting the price of the product or by carrying liability insurance. This simply is not the law.

Neither side requested the judge to charge the seventh risk/utility factor, and there was a timely objection. In fact, when the judge concluded his charge, defense counsel immediately told the judge that "[he] read the seventh factor which should not have been read." Indeed, the judge admitted that reading the seventh factor to the jury was inadvertent, but he did not know what he

---

[3] Here the judge did not choose the particular risk/utility factors that have significance to this case. As has been explained in section 2(b) of the *Restatement (Third) of Torts: Products Liability* and the comments thereto, the various risk/utility factors can be summarized and rephrased as merely imposing the duty upon plaintiff to prove "a reasonable alternative design ... the omission ... [of which] renders the product not reasonably safe." *Restatement,* § 2(b). The other factors of the risk/utility analysis apart from the presentation of this alternative design merely bear upon the jury's determination of whether the proposed design was reasonable.

could say to the jury without making the error even worse. The judge stated "If . . . I said anything I just felt it would drive the nail deeper." Defense counsel agreed that he did not know how to correct it, and the court answered, "You have grounds for appeal." Defendants again raised this issue in their new trial motion, and again the judge acknowledged that he was in error when he "failed to edit out something that should have been edited out, which was item number seven of Model Charge 5.34B, the risk/utility analysis." Nevertheless, the judge denied the new trial motion noting that it was but one sentence out of a forty page charge. The judge continued that he would "defer to the Appellate Division," but in his opinion the outcome of the case did not turn on this aspect of the charge.

Of course, the mere mention of insurance in a case is not enough to warrant a mistrial or a new trial. *See Runnacles v. Doddrell,* 59 *N.J.Super.* 363, 369, 157 *A.*2d 836 (App.Div.1960).[4] While in this case the judge's error may have been, as he noted, only one sentence of a forty page charge, the jury was clearly told that they could base liability on the defendants' ability to spread the loss through insurance.

This is a far cry from the mere mention of insurance, and we agree that if there had only been some inadvertent mention that the defendants were insured or even self-insured, it would not have affected liability in this case. A mention of insurance is quite different from an explanation to the jury that the ability of the defendants to shift the risk through the price of the product or insurance to all users of the product may be accepted by the jury as a basis for liability. Compare *Green v. General Motors, supra,* at —— ——, —— *A.*2d at —— - ——, 1998 WL 116851 (slip op.

---

4 In *Navarro v. George Koch & Sons, Inc., supra,* a case in which the seventh factor also was charged to the jury, the court stated that the "mere mention of insurance here does not rise to the level of prejudicial error in this case." 211 *N.J.Super.* at 577, 512 *A.*2d 507. Yet, in *Navarro* the court had already determined to reverse when this brief mention was made of the inclusion of the insurance factor, and the issue was not discussed at length.

at 26–30), where we found a mistaken charge to be harmless error. There, however, the jury answered specific interrogatories that were not affected by the mistaken charge. We determine, therefore, that this charge constituted reversible error.[5] Erroneous portions of a jury charge do not correct themselves; "otherwise-reversible error dissipates only if the erroneous portions of the charge are expressly withdrawn by the trial court." *Feldman v. Lederle Labs.*, 132 *N.J.* 339, 346, 625 *A*.2d 1066 (1993); *Pucci v. Weinstein*, 8 *N.J.Super.* 247, 250–51, 73 *A*.2d 843 (App.Div.1950).

### *IV.*

Another error is apparent from the record. Plaintiff's expert approximately duplicated the jammed starting mechanism by inserting a screwdriver through a screen on the shredder. This immobilized the shredder-bagger's impeller, preventing the starter cord from fully extending. The screwdriver had been marked for identification and at the close of the plaintiff's case, plaintiff attempted to move the screwdriver into evidence. The judge reserved his decision. After defendants rested, plaintiff again asked for the admission of the screwdriver and screen into evidence. The judge ruled that he would admit them into evidence only if the jurors asked for the screwdriver in order to aid them "to experiment for their deliberations." In such a case the judge stated he would send the screen and screwdriver into the jury room. Shortly after the jury commenced its deliberations, it sent out a note requesting the screen to be placed on the back of the machine and the screwdriver to be sent into the jury room. Defendants made an off-the-record objection, the existence of which has not been disputed by plaintiff. Defense counsel objected on the basis that the jury would then be able to conduct its own tests of the original and alternate design. Thus, depending on

---

[5] We do not treat here the situation where, under similar circumstances, the trial judge carefully explains to the jury immediately following this misstatement that it was made in error and could not be a permissible consideration. A strong enough charge might have been able to dissipate the effect of this error.

how the jury tested the machine, it would in effect be creating additional evidence without evidentiary safeguards.

We have no hesitancy in stating that the judge could, with proper instructions, have permitted the shredder-bagger, screen and screwdriver to be sent into the jury room. *See Muchell v. V & V, Inc.*, 263 *N.J.Super.* 412, 622 *A.*2d 1365 (Law Div.1992) ("An experiment or demonstration is proper when conducted by the jury with the use of exhibits properly submitted to it for the purpose of testing the truth of statements made by witnesses or *duplicating* tests made by witnesses in open court") (quoting *Geo. C. Christopher & Son, Inc. v. Kansas Paint & Color Co., Inc.*, 215 *Kan.* 185, 523 *P.*2d 709, 721, *reh'g denied*, 215 *Kan.* 510, 525 *P.*2d 626 (1974)) (emphasis in original). *See also Banghart v. Origoverken, A.B.*, 49 *F.*3d 1302, 1306–07 (8th Cir.1995) (noting that the jurors' experiments to "duplicate" the tests described at trial by the plaintiff's expert "did not result in juror consideration of extrinsic testimony"); *Commonwealth v. Pixley*, 42 *Mass.App.Ct.* 927, 677 *N.E.*2d 273, 275, *review denied*, 425 *Mass.* 1102, 680 *N.E.*2d 101 (1997) (noting that it is "not an abuse of discretion to allow an exhibit into the jury room," as long as any jury experimentation therewith was "within the scope of the evidence presented at trial"); *Wachtendorf v. Harkins & Co.*, 518 *S.W.*2d 599, 602 (Tex.Civ.App.1974) (noting that the jurors' "reenactment ... of a demonstration presented to the jury during the course of the trial," was "not such as to amount to the reception of new evidence by the jury," because this was "merely a duplication of what had occurred during the trial in the court room").

In this case, however, there were no instructions limiting the jury's use of the physical evidence. The jury should have been told in unequivocal terms that it could do nothing more than attempt precisely what the witness had done, *i.e.*, to tip the shredder-bagger with the cord jammed at the position testified to by the plaintiff. The jury also might have attempted to see the difference between the force needed to tip the shredder-bagger with its wheels permitted to roll backwards under the pressure of

the starter's foot, and contrast this with the force needed if the wheels were stationary. All of this had been the subject of testimony. Because there had been no testing of the machine with the starting mechanism rotated ninety degrees, the jury could not expand upon the evidence by attempting this physical test to see if, in fact, the machine was harder to tip. *See Muchell, supra,* 263 *N.J.Super.* at 418, 622 *A.*2d 1365.

We do not know what the jury did in the jury room, or even if the jury had devised some other method to make the machine safer. All that we know is that there were no controls placed upon experimentation, and this was error. We might even question whether it was wise to permit the jury to set up the machine to duplicate the plaintiff's expert's simulation. Rather, this might have been done by having the machine in evidence appropriately modified, with counsel's review, before the jury would be permitted to see how it tipped. If the court thought that there was insufficient control over the jury's experimentation, so that extraneous factors could have crept into this case, the instruction should have been that no experiments at all should be performed. The error we see here, however, was that the jury had no instructions, and therefore its actions were not appropriately limited. This error, when combined with the erroneous charge, convinces us that a new trial on liability must be ordered. *See Feldman v. Lederle Labs., supra,* 132 *N.J.* at 352, 625 *A.*2d 1066.

### V.

Another problem in this case is that plaintiff was permitted to introduce into evidence a graphical representation of its expert's testimony. Because these figures might have been considered an integral part of the testimony, it was discretionary with the trial judge to permit the diagrams to go into evidence or to withhold them on the basis that the jury had seen and heard the expert, and the diagrams were merely cumulative evidence. As noted in *N.J.R.E.* 611(a), the trial court is to "exercise reasonable control over the mode and order of . . . presenting evidence so as

to (1) make the ... presentation effective for the ascertainment of the truth...." We cannot say that it was unreasonable to permit plaintiff's expert's diagrams to go to the jury.

Defendants also object, however, to its expert's diagram and chart being withheld from the jury. While it was unusual for the court to have permitted plaintiff's expert's diagram to go to the jury, fundamental fairness demanded that the same courtesy be extended to the similar exhibit of defendants' expert's opinion. The better practice would have been, however, for neither of the diagrams to have gone to the jury, since each was merely "a visual representation of the expert's opinion," and the matters contained therein had "already been the subject of testimony." *See Fried v. Aftec, Inc.,* 246 *N.J.Super.* 245, 250–52 n. 3, 587 *A.*2d 290 (App.Div. 1991).

As we have noted, the court has the power to admit such evidence. This power should be sparingly exercised, and if exercised, should be done in a balanced fashion so that the opinions of the expert on one side of the case are not before the jury in graphical form, while the opinions from the opposing expert are left merely for the jury's recollection. Again, we note the cumulation of error here requiring the new trial. *See Feldman v. Lederle Labs., supra,* 132 *N.J.* at 352, 625 *A.*2d 1066.

### *VI.*

Lastly, we treat the issue of the alleged impropriety of counsel on both sides. The obvious personality conflict between counsel predated the trial and is evident in their correspondence both with each other and the court. We note the obvious distress to the trial judge who after the new trial motion apologized on the record for the transcript and noted that no amount of his pleading, entreating and cajoling was able to bring complete order to this trial.

Defendants insist that blame must be laid at the feet of plaintiff's counsel, but we agree with the trial judge that there "may have been right and wrong on both sides. There was a tremen-

dous personality conflict, ... [but the] jury was charged not to decide [the case] based on the performance of counsel." Specifically regarding the conduct of plaintiff's counsel, the judge stated that "while annoying, I do not believe [that misconduct] in any way controlled the outcome."

In view of the reversal that is otherwise required, we need not give our view of the conduct of both counsel. We have merely read the record, and it has been said that even the best and most accurate written trial transcript is "like a dehydrated peach," in that it has "neither the substance nor the flavor of the peach before it was dried." *Trusky v. Ford Motor Co.*, 19 *N.J.Super.* 100, 104, 88 *A.*2d 235 (App.Div.1952). *See also State v. Ramseur,* 106 *N.J.* 123, 216, 524 *A.*2d 188 (1987); *State v. Gilmore,* 103 *N.J.* 508, 547, 511 *A.*2d 1150 (1986) (Clifford, J., dissenting).

There has been no challenge by defendant to the damage award, and neither side has briefed the issue of whether the alleged errors affected the damages returned by the jury. We have determined here that the liability judgment must be vacated and the matter remanded for a new trial. We express no opinion as to whether the damage verdict can be saved. In fact, the parties may be in agreement as to whether the damage aspects of the claim need to be retried in the event the plaintiff is again successful on the issue of liability. We leave this matter to the trial judge on remand.

The judgment in favor of plaintiff is vacated, and the matter is remanded to the Law Division for a new trial.