802 A.2d 551

MOISES HINOJO, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. NEW JERSEY MANUFACTURERS INSURANCE COMPANY, DEFENDANT–APPELLANT/CROSS–RESPONDENT, AND NIAGRA, A NEW YORK CORPORATION, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued February 26, 2002—Decided July 12, 2002.

264

Before Judges SKILLMAN, CARCHMAN and WELLS.

*Thomas A. Sparno* argued the cause for appellant/cross-respondent, (*Connell Foley,* attorneys; *George J. Kenny,* of counsel; *Mr. Sparno,* on the brief).

*Steven J. Greenstein* argued the cause for respondent/cross-appellant, (*Tobin, Koster, Oleckna, Reitman, Greenstein & Konray,* attorneys; *George W. Conk of Tulipan & Conk, of counsel; Mr. Conk and Mr. Greenstein,* on the brief).

*Pellettieri, Rabstein & Altman,* attorneys for amicus curiae ATLA–NJ, (*Anne P. McHugh and Andrew L. Watson,* on the brief).

The opinion of the court was delivered by

SKILLMAN, P.J.A.D.

This is a products liability personal injury action against the designer of a safety guard on a punch press. Plaintiff worked as a punch press operator for the Durex Company (Durex) in Union. Durex purchased thirty-five to forty punch presses manufactured by defendant Niagara including the one operated by plaintiff. Defendant New Jersey Manufacturer Insurance Company (NJM) was the workers' compensation insurer for Durex from 1946 through the date of plaintiff's accident on November 20, 1995.

Sometime in the 1950s, Durex asked NJM to design a new safety guard for its punch presses. Defendant's engineer, A.J. Ehrhardt, designed a "flap guard" for the presses and provided parts for their installation. Although Durex actually fabricated the guards, Ehrhardt showed Durex how to install and maintain them. In subsequent years, NJM made various suggestions to Durex for improvements in the safety guards, which are discussed in some detail later in this opinion.

Plaintiff's job at Durex was to position a small piece of metal under the press by hand and, when the piece was properly positioned, to depress a foot pedal, causing the "ram" to come down and force the piece against a die, thereby stamping words, letters, or numbers onto the metal. Although the press normally would be operated from a sitting position, plaintiff sometimes would stand when he got tired of sitting. The process also required plaintiff to keep the die oiled and to wipe excess oil from

the sides of the die, which plaintiff usually did with a glove he wore on his left hand.

While operating the press on November 20, 1995, plaintiff inserted a metal piece with his right hand and then reached in with his gloved left hand to wipe oil from the piece before stamping it. The safety guard designed by NJM did not block the entry of plaintiff's hand into the mechanism of the punch press because the guard was activated by the operator depressing the foot pedal and wiping oil did not require use of the foot pedal. However, while he was wiping the oil, plaintiff accidentally stepped on the foot pedal, causing the ram to descend onto his left pinky finger. The finger was so severely crushed that it could not be saved, and the doctor who treated plaintiff could do nothing more than fold some skin over the crush site to close the wound.

Plaintiff subsequently brought this personal injury action against Niagra and NJM. Before trial, Niagra filed for bankruptcy. As a result, plaintiff's claim against Niagra was dismissed by stipulation and the case went to trial solely against NJM.

Plaintiff's theory of liability against NJM, presented primarily through the testimony of his safety-engineering expert, Theodore Moss, was that the flap guard designed by NJM was defective because it was not a "sweep guard," that is, it did not move through the "point of operation" to push a hand away from harm; rather, it merely erected a barrier in front of the danger area, preventing a hand from entering but doing nothing to remove a hand already in the zone of danger. Moreover, because the guard did not completely block access, it was only a partial barrier. Moss explained that "the basic concept of guarding" was to make it "impossible" for the operator to contact the point of operation while the press was activated, and that the flap guard designed by NJM did not achieve that goal. Exacerbating the problem was that, although the press was intended to operate with the worker in a sitting position, the worker often would stand, causing him to have to reach into the machine at an inappropriate angle.

Moss also testified that there were feasible alternative designs that could have avoided plaintiff's accident. The best was the Type-A gate guard, in which the machine cannot operate when the gate is open, and when the gate is closed, the operator's hand cannot reach inside.

The jury found that the safety guard on the punch press operated by plaintiff had been defectively designed by NJM and that that defective design was a proximate cause of plaintiff's injuries. The jury awarded plaintiff $675,000 for his injuries.

NJM moved for a judgment notwithstanding the verdict or, in the alternative, a new trial on all issues or on damages only, with the option of a remittitur. The trial court denied both the motion for a judgment notwithstanding the verdict and for a new trial on all issues, but granted NJM's motion for a new trial on damages unless plaintiff was willing to accept a remittitur to $400,000. Plaintiff accepted the remittitur and judgment was entered against NJM for $400,000 plus medical expenses of $4586.78, lost wages of $4650 and pre-judgment interest of $81,911.38.

NJM appeals from the judgment in plaintiff's favor, and plaintiff cross-appeals from the order for a new trial on damages, subject to a remittitur. NJM argues that plaintiff's claim should have been dismissed because the safety advice it gave to plaintiff's employer, Durex, did not subject it to liability under the Products Liability Act (PLA), *N.J.S.A.* 2A:58C–1 to –11. In the alternative, NJM argues that it is entitled to a new trial because the trial court committed reversible error in failing to instruct the jury regarding superseding causation and in failing to inform the jury that it had to find there was a safer, practical and feasible alternative design for a punch press safety guard in order to find NJM liable. NJM also contends that the trial court committed various other errors with respect to the admission of evidence at trial. On his cross-appeal, plaintiff argues that the trial court erred in concluding that the damages verdict was excessive.

We conclude that the trial court correctly determined that NJM, as the designer of the safety guard installed on the punch press

operated by plaintiff, is subject to liability under the PLA for the alleged defect in that design. However, NJM is entitled to a new trial because the trial court committed reversible error in failing to instruct the jury regarding superseding causation and in failing to inform the jury that to find NJM liable it had to find that there was an alternative design for a punch press safety guard that was practical and feasible and safer than the flap guard designed by NJM. We affirm the order of the trial court granting NJM a new trial on damages subject to a remittitur. However, in view of our reversal of the liability verdict in plaintiff's favor, plaintiff should be afforded an opportunity to reconsider his acceptance of the remittitur.

I

■ NJM argues that the trial court should have granted its motion to dismiss plaintiff's products liability claim on the grounds that it was not a "manufacturer" of the safety guard on the punch press operated by plaintiff and that the advice it gave to Durex was not a "product" within the intent of the PLA.

The PLA defines a "[p]roduct liability action" as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." *N.J.S.A.* 2A:58C–1b(3); *N.J.S.A.* 2A:58C–8. The PLA imposes liability upon "[a] manufacturer ... of a product ... if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it ... was designed in a defective manner." *N.J.S.A.* 2A:58C–2(c). As a result of a 1995 amendment to the PLA, which became effective on June 29, 1995 (*L.* 1995, *c.* 141, § 3), a few months before plaintiff's accident, the PLA now defines a "manufacturer" of a product as including "any person who designs [or] formulates ... any product or component of a prod-

uct." *N.J.S.A.* 2A:58C–8.[1]

NJM clearly designed the flap safety guard that Durex installed in its punch presses and thus was a "manufacturer" of this product under the definition now set forth in *N.J.S.A.* 2A:58C–8. NJM provided detailed conceptual drawings to Durex for the flap guards. NJM also provided Durex with parts to use in constructing the guards, and it gave Durex's employees instructions regarding the installation, repair and replacement of the guards.

The only case NJM cites in support of its argument that it was not a manufacturer of the flap guard is *Potwora v. Grip*, 319 *N.J.Super.* 386, 725 *A.*2d 697 (App.Div.), *certif. denied*, 161 *N.J.* 151, 735 *A.*2d 575 (1999), which involved an accident that occurred prior to the 1995 amendment and did not even mention the definition of "manufacturer" now contained in *N.J.S.A.* 2A:58C–8. Moreover, the essential rationale of *Potwora* was not that the designer of a product cannot be held liable under the PLA, but rather that a manufacturer which sold its entire business could not be held liable for alleged defects in a product manufactured and sold by the successor corporation based solely on the fact that it had originally designed that product. *Id.* at 396–400, 725 *A.*2d 697. Therefore, we conclude that NJM was a manufacturer of the flap safety guard installed in the punch press operated by plaintiff within the intent of *N.J.S.A.* 2A:58C–8.

NJM's alternative argument that the advice it gave Durex was not a "product" which could provide a basis for liability under the

---

[1] Because chapter 141 of the Laws of 1995 was enacted as a "supplement" rather than an "amendment" to the PLA, it is arguable that the definition of "manufacturer" in *N.J.S.A.* 2A:58–8 only applies to that act, which relieves a "product seller" from liability under the PLA if the conditions set forth in *N.J.S.A.* 2A:58C–9 are satisfied. In any event, the broad definition of "manufacturer" in *N.J.S.A.* 2A:58C–8 to include "any person who designs [or] formulates" any product or component of a product is reflective of prior New Jersey case law. See *Zaza v. Marquess & Nell, Inc.*, 144 *N.J.* 34, 50–54, 675 *A.*2d 620 (1996); *Michalko v. Cooke Color & Chem. Corp.*, 91 *N.J.* 386, 395–401, 451 *A.*2d 179 (1982).

PLA is simply a reformulation of the argument that it was not a manufacturer of the flap guard. NJM did not simply advise Durex to install safety guards on its punch presses. Rather, NJM provided detailed conceptual drawings for the specific flap safety guards Durex installed on the presses as well as assistance in the installation, maintenance and repair of this product. This active role in the design and installation of the safety guards made NJM a manufacturer of a product under the PLA.

For similar reasons, we reject NJM's argument that it cannot be held liable under the PLA because it simply provided safety advice as Durex's workers' compensation insurer. The insurer of an employer's liability under the Workers' Compensation Act, *N.J.S.A.* 34:15-1 to –128, cannot assert the employer's immunity from tort liability. As Judge Goldmann commented in *Mager v. United Hosps. of Newark,* 88 *N.J.Super.* 421, 426, 212 *A.2d* 664 (App.Div.1965), *aff'd o.b.,* 46 *N.J.* 398, 217 *A.2d* 325 (1966), the Legislature did not intend "to blend the jural personalities of employer and his compensation carrier so as to bar a common law action against the latter." Consequently, if an insurer undertakes to perform services that go beyond simply providing workers' compensation coverage to an employer, it becomes subject to the same tort liability as any other party who performs such services. *Id.* at 428–29, 212 *A.2d* 664. By providing detailed conceptual drawings, parts and assistance for Durex's use in constructing and installing safety guards on its punch presses, NJM performed a service that was indistinguishable from that of any other designer of a safety device for a machine, thereby subjecting itself to the same potential liability under the PLA.[2]

---

[2] There is no need for us to decide whether NJM would be subject to a products liability claim under the common law principles set forth in the *Restatement (Third) of Torts: Prods. Liab.* § 19 because the PLA supersedes any conflicting common law principles. *See Tirrell v. Navistar Int'l, Inc.,* 248 *N.J.Super.* 390, 398, 591 *A.2d* 643 (App.Div.), *certif. denied,* 126 *N.J.* 390, 599 *A.2d* 166 (1991).

II

 NJM argues that the trial court erred in failing to instruct the jury concerning superseding causation, particularly with regard to Durex's failure to heed NJM's warnings that the flap guard NJM had designed in the 1950s was no longer considered to provide adequate safety for a punch press operator.

 A manufacturer of a defective product may be relieved of liability if there was an intervening, superseding cause of an accident caused by the product. *Brown v. United States Stove Co.*, 98 *N.J.* 155, 171–75, 484 *A.*2d 1234 (1984); *see also Coffman v. Keene Corp.*, 133 *N.J.* 581, 608–09, 628 *A.*2d 710 (1993). The question whether the manufacturer of a defective product should be relieved of liability based on wrongful conduct of another party which was a more immediate cause of an accident "implicates concerns for overall fairness and sound public policy." *Brown, supra*, 98 *N.J.* at 173, 484 *A.*2d 1234; *see also Lynch v. Scheininger*, 162 *N.J.* 209, 226–28, 744 *A.*2d 113 (2000). "[W]hether an intervening event supersedes a defendant's liability for antecedent negligence[,]" or as in this case, distribution of a defective product, is ordinarily a question "for jury determination." *Id.* at 235, 744 *A.*2d 113; *see also Yun v. Ford Motor Co.*, 143 *N.J.* 162, 669 *A.*2d 1378 (1996), *rev'g on dissent*, 276 *N.J.Super.* 142, 158, 160–61, 647 *A.*2d 841 (App.Div.1994).

Our courts have recognized that an employer's negligence in the maintenance of an industrial machine may in some circumstances constitute a superseding cause that will relieve the manufacturer from liability for a defect in the machine. *See, e.g., Coffman, supra*, 133 *N.J.* at 608–09, 628 *A.*2d 710; *Brown, supra*, 98 *N.J.* at 172–75, 484 *A.*2d 1234; *Finnegan v. Havir Mfg. Corp.*, 60 *N.J.* 413, 423, 290 *A.*2d 286 (1972); *Navarro v. George Koch & Sons, Inc.*, 211 *N.J.Super.* 558, 571–75, 512 *A.*2d 507 (App.Div.1986). For example, in *Brown* an employee was injured in a fire caused by a heater designed and manufactured by the defendant. The heater included various safety devices, which the plaintiff's employer had removed. Plaintiff's expert testified that those safety

devices were easily removable, and that it was reasonably foreseeable the devices would be removed. The expert also testified that it would have been more difficult to remove the safety devices if an alternative design had been used. In concluding that the employer's removal of the safety devices constituted an intervening, superseding cause of plaintiff's accident, the Court stated:

[T]he record discloses that the heater was deliberately altered for the specific purpose of operating it beyond its safe capacity and, further, it was wilfully, persistently and intensively misused in this fashion for an extraordinarily long period of time, perhaps for as long as fifteen years. In the face of this chronic misconduct, the inference to be drawn is that even were the original design modified in accordance with the plaintiff's proposal, it would not realistically or likely have deterred or obstructed these subsequent abusers of the product or have prevented the kind of injury that resulted from the misuse.

[*Id.* at 174, 484 *A.2d* 1234.]

In *Lopez v. Entwistle Co.*, 214 *N.J.Super.* 680, 520 *A.2d* 849 (Law Div.1986), an employee was injured while working on a machine that was manufactured without barrier guards. When the manufacturer subsequently offered to supply barrier guards, the employer informed the manufacturer that the machine was no longer in use. In ruling that the jury should be asked to determine whether the employer's rejection of the manufacturer's offer to provide barrier guards was a superseding cause of plaintiff's accident, the court concluded that "a manufacturer of a defective machine [should not] remain liable for eternity ... when it attempts to correct the defect post-sale. It is ... in the public interest for defective and potentially dangerous machines to be rectified." *Id.* at 682, 520 *A.2d* 849. The court held that in such a case, the manufacturer should be permitted to prove that the superseding cause of the accident was the employer's rejection of the proffered cure of the defect. *Id.* at 683–84, 520 *A.2d* 849; *see also Coffman, supra,* 133 *N.J.* at 608, 628 *A.2d* 710 ("An employer's conduct, in either thwarting effective dissemination of a warning or intentionally preventing employees from heeding a warning [of a dangerous condition of a machine], may be a subsequent supervening cause of an employee's injury that will serve to break the chain of causation between manufacturer and employee.").

The record in this case created a factual issue as to whether Durex's failure to heed NJM's warnings that the flap guard did not provide adequate protection for its punch press operators constituted a superseding cause of plaintiff's accident. On July 5, 1995, four-and-a-half months before plaintiff's accident, NJM sent Durex a letter which stated in part:

> Recent conversations on power press guarding at some other stamping operations reminded me of the need to discuss with you the OSHA Standard for power press guarding. The present code requires the point of operation to be guarded and prevent an operator from reaching over, under, around or through to the point of operation. It is my understanding that the interlocked press barrier (flap) guards used on many of your presses when originally installed were considered a major safety improvement from the normal operating practices of the time. . . .

> It is also my understanding that as the newer codes went into effect and the mechanical interlocked press barrier guards were replaced with the Rotec air actuator guards, that side barriers and stationary upper barriers were installed. Many of these have, over the years, been removed and/or modified and the interlocked press barrier guard has again become the most predominant safety feature in your hand press operations. As we have discussed, the interlocked press barrier guard is effective in moving hands or arms out of the way if and only if the operator is in the proper position. This means that all operators who choose to stand while operating may be able to reach over and make the flap guard ineffective in preventing injury. You should endeavor to have barrier guards installed so that the operation area danger points are as completely enclosed as possible.

On October 18, 1995, NJM sent another letter to Durex which stated in part:

> An inspection for the purpose of an underwriting evaluation was conducted by the writer at your metal fabricating operation on October 9, 1995. . . .

> The foot-operated power presses throughout the plant operation that employ a flap guard as the primary safety control to protect operators were discussed. As I noted, the flap in itself does not provide compliance per the over, under, around or through protection requirements. It is my understanding that when originally installed, a full barrier was also employed to totally enclose the die area. Many of the outer frame parts are still intact on the presses, but the barrier, whether expanded metal or Lexan, has since been removed. During our telephone conversation on Wednesday, October 11, 1995, we continued a discussion on this topic. You noted concern about creating a pinch point between the flap and the upper barrier surfaces. In our opinion, the need is not to have those tolerances between the upper and lower barrier device, but to make it a very difficult procedure to reach over the top of the flap guard itself. Several inches between the outside edge of the flap and the inside bottom edge of the upper fixed barrier are acceptable. The main objective is to make it very difficult for an operator to reach into the point of operation over the actuating plane.

On November 9, 1995, NJM sent yet another letter to Durex which stated in part:

> The foot-operated power presses throughout the plant that employ an interlocked press barrier guard as the primary safety control to protect operators were discussed. Many of these operations involve hands-in or very close to die operations. These presses should be converted to incorporate a Type A barrier device or two-hand controls and pull-outs.

However, Durex did not make any changes in the flap guards or other safety features of its punch presses in response to the recommendations contained in these letters.

In addition to the quoted letters, NJM sent Durex literature on "pull-back devices and Type 'A' gate guards" in 1992, which NJM had said would "offer protection against most press malfunctions[,]" but Durex failed to make any changes in its safety guards at that time. Moreover, Edward Denholtz, a principal owner and chief executive of Durex from the time of its founding in the 1940s until sometime after plaintiff's accident, testified that although he did not recall receiving a recommendation from NJM to install a Type A gate guard on Durex's punch presses, he would not have accepted such a recommendation because he did not believe a gate guard was safer than a flap guard and the installation of gate guards would have cut Durex's production in half.

Under this evidence, the jury could have found that NJM's design of the flap guard was defective, and that that defect was a cause of plaintiff's accident, but that Durex's unwillingness to change the guard or undertake any other safety improvements in its punch presses during the period preceding plaintiff's accident was a superseding cause of the accident. However, the trial court denied NJM's request to give the jury a superseding causation instruction, stating that this subject would be adequately covered by a standard proximate cause instruction. In accordance with this ruling, the court instructed the jury:

> [B]y proximate cause it is meant that the defect in the product was a substantial factor, or any other cause would be a substantial factor which singly or in combination with any other cause brought about the accident.
>
> In other words, [if you] find that there was a design defect, and that that design defect combined with any other cause or factor in bringing substantial—in bringing

about the accident, then the plaintiff has met the burden of proving that the design defect was a proximate cause, and would be entitled to recover against the defendant over those circumstances. Whether the additional concurrent cause is the plaintiff's negligence, or whether it is the negligence of any nonparty, including the employer or including the manufacturer of the punch press itself that was manufactured for that party, if the plaintiff satisfies the burden of showing that the defendant NJM was a product designer, and if the design was defective, and if that defective design joined with any other cause in bringing about the plaintiff's injuries, then the plaintiff would be entitled to recover from New Jersey Manufacturers.

. . . .

[A]ll that the plaintiff has to show is that the negligence of the design of the component flap guard was a cause, a concurrent cause with any other cause in order to be able to recover. . . .

This instruction did not convey to the jury the concept of superseding causation. As the Court pointed out in *Lynch, supra,* quoting from the comments to the *Restatement of Torts:*

A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm. Therefore, if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm.

[162 *N.J.* at 226 (quoting *Restatement (Second) of Torts* § 440 comment b (1965)).]

Thus, the trial court's instruction that plaintiff could show that the alleged defect in the flap guard was a proximate cause of the accident merely by showing that the defect was a "substantial factor which singly or in combination with any other cause brought about the accident" failed to impart to the jury that NJM would not be liable if the jury found that Durex's unwillingness to correct the design defect was "a subsequent supervening cause of [plaintiff's] injury that . . . serve[d] to break the chain of causation between [NJM] and [plaintiff]." *Coffman, supra,* 133 *N.J.* at 608, 628 *A.*2d 710.

In addition, the trial court erred in failing to instruct the jury that to prevail on its products liability claim against NJM, plaintiff had to show that there existed a safer, practical and feasible alternative design for a punch press safety guard.

■ A plaintiff who asserts a design defect products liability claim "must prove under a risk-utility analysis the existence of an alternative design that is both practical and feasible." *Lewis v. American Cyanamid Co.*, 155 *N.J.* 544, 571, 715 *A.*2d 967 (1998); *see also id.* at 560, 715 *A.*2d 967; *Cavanaugh v. Skil Corp.*, 164 *N.J.* 1, 8–9, 751 *A.*2d 518 (2000); *Fiorino v. Sears Roebuck & Co.*, 309 *N.J.Super.* 556, 565 n. 3, 707 *A.*2d 1053 (App.Div.1998). Although the trial court instructed the jury regarding the risk-utility factors, it failed to inform the jury that it was required to consider those factors in determining whether plaintiff had established "the existence of an alternative design that is both practical and feasible." *Lewis, supra,* 155 *N.J.* at 571, 715 *A.*2d 967.

Moreover, the trial court indicated that an analysis of the risk-utility factors was not the exclusive basis upon which the jury could find NJM's design to have been defective. The court began its discussion of the risk-utility factors by telling the jury that "[o]ne of the ways that a party may show that the design is defective is by resort to and providing proofs related to what is called the 'risk utility analysis.'" The court went on to say:

> Now where the issue is one of design defect, the issue of defect is composed of a balancing of considerations of some of the following factors. And these are factors that come under and may be taken into account in determining whether the design is defective or not.

The court then described six risk utility factors, including "the availability of a substitute product which would meet the same needs [as the flap guard] and not be as unsafe." Thus, this instruction could have left the jury with the impression that the existence of a practical and feasible alternative design for a safety guard on Durex's punch presses were merely one optional factor it could consider in determining whether the flap guard was defective rather than the ultimate issue it had to determine in plaintiff's favor in order to hold NJM liable.

Because an understanding of the principle of superseding causation and of plaintiff's obligation to establish the existence of a practical and feasible alternative design for the safety guards on the punch presses were central to the jury's proper performance

of its fact-finding responsibilities, the trial court's errors in those instructions cannot be found to have been harmless and NJM must be granted a new trial on liability.

## III

NJM also argues that the trial court erred in allowing plaintiff to present evidence concerning codes and regulations adopted after installation of the flap guard on the machine operated by plaintiff as well as alternative designs developed after that date; in prohibiting NJM from introducing a videotape which showed the manner in which plaintiff was trained and how the punch press operates; and in allowing plaintiff to introduce evidence concerning three other accidents that occurred on the punch presses at the Durex facility. Because we have concluded for the reasons set forth in section II of this opinion that the judgment for plaintiff must be reversed and the case retried, and it is unlikely these issues will arise in the same form at a retrial, it is unnecessary to address these additional points. We only note that if similar issues arise at the retrial, the trial court should be guided by the principles set forth in *Lewis, supra,* 155 *N.J.* at 571–75, 715 *A.2d* 967, *Cepeda v. Cumberland Eng'g Co.,* 76 *N.J.* 152, 193, 386 *A.2d* 816 (1978), *Ladner v. Mercedes–Benz of N. Am., Inc.,* 266 *N.J.Super.* 481, 500, 630 *A.2d* 308 (App.Div.1993), *certif. denied,* 135 *N.J.* 302, 639 *A.2d* 301 (1994), and *Crispin v. Volkswagenwerk AG,* 248 *N.J.Super.* 540, 556, 591 *A.2d* 966 (App.Div.), *certif. denied,* 126 *N.J.* 385, 599 *A.2d* 162 (1991).

## IV

On his cross-appeal, plaintiff challenges the order granting NJM's motion for a new trial on damages unless he agreed to accept a remittitur amount of $400,000 for pain and suffering damages. See *Mulkerin v. Somerset Tire Serv., Inc.,* 110 *N.J.Super.* 173, 177, 264 *A.2d* 748 (App.Div.1970) ("[A] plaintiff who accepts a remittitur may not appeal, but where defendant appealed, plaintiff may cross-appeal."); *accord Baxter v. Fairmont Food*

*Co.*, 74 *N.J.* 588, 595–96, 379 *A.*2d 225 (1977). Plaintiff's only argument is that the trial court erred in concluding that the jury verdict was excessive. Plaintiff does not contest the amount of remittitur.

"[A] trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injury and resulting disability shown as to shock his conscience and to convince him that to sustain the award would be manifestly unjust." *Id.* at 596, 379 *A.*2d 225. "Nevertheless, the process of evidence evaluation called 'weighing' is not 'a *pro forma* exercise, but calls for a high degree of conscientious effort and diligent scrutiny.'" *Id.* at 598, 379 A.2d 225 (quoting *Dolson v. Anastasia*, 55 *N.J.* 2, 6, 258 *A.*2d 706 (1969)). A damages verdict "is not sacrosanct and can never survive if it amounts, manifestly, to a miscarriage of justice." *Id.* at 598, 379 *A.*2d 225. An appellate court applies the same general standard in reviewing a trial court's decision on a motion for a new trial on damages, except that it must extend appropriate deference to the trial court's "feel of the case." *Id.* at 600, 379 *A.*2d 225.

In concluding that the damages awarded plaintiff were excessive, the trial court noted:

The question is whether what is awarded suggests a miscarriage of justice or ... is shocking or is regarded as being extreme. And in this instance, I believe ... it has reached that level. The injury that was sustained was certainly significant, very serious injury. It was the loss of the fifth finger, the pinky on the left hand of the plaintiff.... [T]he dismemberment was significant enough that he was unable to be fitted with a prosthesis. So that the result is that he has ... a disfigurement, which he testified is troublesome to him.

[H]is own emotional reaction to that is one of the elements ... that would be regarded in evaluating the pain and suffering, the loss of enjoyment of life, and those non-economic factors that would be appropriate for a jury to take into account in awarding damages.

[T]he testimony was that ... immediately following the accident he was numb. He walked to ... his supervisor and showed him ... his hand—and eventually ... he was taken to the infirmary and then onto the hospital.

He testified and the doctors also did, that—as far as these things go the healing ... yield[ed] a good result, and that, nevertheless, ... he is inhibited in some respects, in his ability to do things that one would utilize ... the fifth finger for.... He was able to return to work. He worked at a different capacity when he

returned to [Durex], but he eventually took a job ... with a newspaper and is currently working ... in that capacity.

I think he's 37, 38 years old now. The life expectancy that was presented to the jury was approximately 40 years or thereabout, and unquestionably, the absence of a finger over that period of time would be something that would militate towards the award of a substantial amount.... [A]ccepting all of this, and attempting to give credit to the plaintiff for them, ... I nevertheless ... come to the conclusion that I am shocked at the extent of the verdict.

[P]laintiff has presented summaries of cases or abstracts of cases in which sums have been awarded in the same range as was awarded here. In particular, there was a case, ... which was in Essex County, in 1994, there was a verdict of $750,000 for the loss of an index finger. The abstract indicates that that matter was eventually settled before appeal at $600,000.... [T]his amount in the 600 to $700,000 range is not an excessive or an unreasonable amount.

I note, ... there is a difference, ... and I believe it's a significant difference between an index finger and ... a pinky. The pinky obviously helps with holding, grasping things, but certainly in terms of function, in terms of the ability to engage in common, everyday tasks, the loss of ... an index finger is a significantly greater loss than the loss of the small finger, the pinky.

....

[F]rankly, I believe that $400,000 is still a little high, but I believe, in light of the jury's determination and taking into account a comparison of the cases that happened, cited by the plaintiff, that a fair and adequate compensation for the non-economic losses of the plaintiff, in this case, would be, and should probably be fixed at $400,000.

Extending due deference to the trial court's feel of this case, including his opportunity to directly observe plaintiff's finger, we affirm the grant of a new damages trial, subject to the remittitur, substantially for the reasons set forth in the trial court's opinion. However, because plaintiff accepted the remittitur predicated on the trial court's ruling that NJM was entitled to a new trial on damages only, and we have now concluded for the reasons set forth in section II of this opinion that NJM is also entitled to a new trial on liability, plaintiff should be afforded an opportunity to reconsider his acceptance of the remittitur.

Accordingly, we reverse the judgment for plaintiff and remand the case to the trial court for a new trial. If plaintiff reaffirms his decision to accept the remittitur, the new trial will be limited to the issue of liability. If plaintiff now rejects the remittitur, the new trial will be on all issues.