LILA A. FRITSCHE AND ALLEN J. FRITSCHE, PLAINTIFFS-APPELLANTS, v. WESTINGHOUSE ELECTRIC CORPORATION, A CORPORATION OF THE COMMONWEALTH OF PENNSYLVANIA, AND JACOB J. BENEDETTO, DEFENDANTS-RESPONDENTS.

Argued December 2, 1969—Decided February 16, 1970.

*Mr. Gerald R. Stockman* argued the cause for plaintiffs-appellants (*Messrs. Schoch, Dietrich & Stockman,* attorneys).

*Mr. Kenneth J. Dawes, Jr.* argued the cause for defendants-respondents (*Messrs. McLaughlin, Dawes & Abbotts,* attorneys).

The opinion of the court was delivered by

PROCTOR, J. On August 29, 1965, the plaintiff, Lila A. Fritsche, was a passenger in an automobile operated by her husband, Allen J. Fritsche. While stopped for a traffic light in North Plainfield, the vehicle was struck from the rear by an automobile owned by the defendant, Westinghouse Electric Corporation, and driven by its agent, the defendant, Jacob Benedetto. As a result of the impact, Mrs. Fritsche was injured. In the ensuing litigation, a jury awarded her $80,000 for her injuries and her husband $10,000 on his *per quod* claim. Defendants moved for a new trial contending that there were trial errors and that the verdict was excessive. The trial judge denied the motion. On appeal, the

Appellate Division, in an unreported opinion, found no merit to any of defendants' claims of trial error. It concluded, however, that the jury's verdict was excessive and "manifestly was the result of mistake, partiality, prejudice, or passion." Accordingly, it remanded the case for retrial on the issue of damages only. We granted plaintiffs' petition for certification. 54 N. J. 560 (1969).

At the trial the issue of liability was not seriously contested and the jury's finding on this point is fully supported by the record. The case was tried primarily on the issue of whether plaintiff's condition was proximately caused by the accident or was instead the result of preexisting spinal arthritis. As a result, the question of the state of her present and probable future condition, upon which the issue of damages is predicated, intertwines with the question of whether her condition was proximately caused by the accident. Under the Appellate Division's mandate for remand on the issue of damages, it is likely that a trial judge would have compelled the plaintiffs to relitigate the question of whether Mrs. Fritsche's condition was the proximate result of defendants' negligence. A retrial on this issue would work on unjust result on the plaintiffs because it virtually would force them to relitigate the entire case. Yet the jury's conclusion that plaintiff's condition was caused by the accident was fully warranted by the expert medical testimony introduced at trial. Indeed, the defendants did not appeal this finding as against the weight of the evidence nor do they question it here. Thus, if there is to be a retrial, which we must determine from a review of the record, the retrial should be concerned solely with an evaluation of Mrs. Fritsche's condition based on the premise that that condition was proximately caused by defendants' negligence.

Prior to the accident, Mrs. Fritsche, a mother of four children in her mid-thirties, was very active and in good health. She had never experienced any difficulties with her neck or back. Her problems began after the rear-end collision which is the subject of this suit.

When the Fritsche car was struck in the rear, Mrs. Fritsche was sitting in the right front seat. The jolt caused her to first strike her head on the post separating the doors and then on the front window. The impact was not severe; property damage was stipulated to be $52.50 and neither her husband, who was driving, nor her children in the back seat were injured. Mrs. Fritsche, however, experienced a severe headache almost immediately and was too ill to join her family for dinner that evening. In the following days she continued to have headaches and started getting nosebleeds. Because she had had some headaches in the past from eyestrain and because the family had just moved from Illinois and did not yet have a family physician, Mrs. Fritsche did not consult any doctors for some time. The headaches continued and grew more severe, however, and after a few weeks she consulted a Dr. Cooley. He apparently did not afford her much relief.

Her condition worsened and on November 15 she came under the care of Dr. Harold Wender, an orthopedic specialist. Dr. Wender diagnosed her condition as "acute cervical, lumbar and dorsal strain," and found that she had limitation of motion and pain in her muscles from her neck to her pelvis. He took X-rays which showed "a straightening of the so-called normal cervical lordotic curve" — a straightening of the normal spinal curve — caused by muscle spasms. Dr. Wender treated her for almost a year trying numerous techniques to alleviate her pain and symptoms. He prescribed out-patient therapy at the Somerset Hospital which included traction to reduce the muscle spasms. He also prescribed various medications including muscle relaxants, pain pills, and injections into her skull. In April, 1966, the doctor ordered her to wear a backbrace. As of this time he had noticed no improvement in her condition, and she continued to complain of pain in her left shoulder and neck area. In August of 1966 her condition further deteriorated. She developed a "shaking type of problem in which her hands shook and her neck — her head was relatively unstable on her

neck, and she presented neurological signs of past-pointing," *i. e.*, she was unable to touch her nose when instructed to do so. These symptoms persisted into September.

It was undisputed that during this time Mrs. Fritsche, who was an avid bowler, bowled on several league teams. Her doctors testified that there was nothing inconsistent with her bowling and the nature of her injuries. None of the defendants' doctors testified on the effect of her bowling.

In September of 1966 she fell while bowling and injured her left knee. The next morning she was admitted to the Somerset Hospital under the care of Dr. Wender. Because of certain neurological symptoms and her previous difficulties with her neck and back, several consulting physicians were called in, including Dr. Arthur W. Culberson, a specialist in neurosurgery. Dr. Culberson performed several tests including a myelogram. This test permits a physician to obtain X-rays of the inside of the spinal column. It is performed by injecting oil into the subject's spine, and then taking X-rays of the spine while a table, upon which the subject's body is strapped, is tilted in various directions. The oil does not mix with the spinal fluid, and its flow through the spinal column defines any areas of mass pushing into the spinal canal. The myelogram disclosed some type of obstruction in the spinal canal in the area of the neck.

As a result of his findings, Dr. Culberson performed a cervical laminectomy. This operation required the doctor to cut approximately three to four inches into Mrs. Fritsche's neck and to expose her spine. He then removed the bone to expose the cord of nerves which runs through the spine and which carries the impulses to the various parts of the body. At the expected place, the doctor found a ridge of bone three quarters of an inch long and a quarter of an inch wide which was pressing on and irritating the nerves. It was his opinion that this spur had compressed the spinal cord and damaged it. He removed the bone which he diagnosed as an osteo-arthropatic spur. The operation left an eight inch scar on Mrs. Fritsche's neck.

Dr. Culberson also gave his opinion of the cause of the condition. Although this evidence is not necessary to the present inquiry since the jury's finding of proximate cause is not raised on this appeal, the testimony does provide background for the operation he performed. It was Dr. Culberson's opinion that the spur preexisted the accident and was a condition common to many people. He did not believe that this osteo-arthropathy was itself affected by the accident, but rather that it made her neck more susceptible to injury by trauma. He testified that the automobile accident caused the spur to damage the spinal cord, and that without the accident she would not have needed the laminectomy. Dr. Wender concurred in this analysis.

Following the operation, Mrs. Fritsche remained in the hospital for a little over a week, during which time she experienced severe headaches. After her release she was totally incapacitated for about six more weeks. By February, 1967, about four months after the operation, she had recovered sufficiently to be released from Dr. Culberson's care. Eventually she improved to the point where she could do some light housework, although she never made a complete recovery.

As she attempted to resume her former activities with her family, some of her earlier symptoms began to return, particularly those manifesting neurological difficulties. She experienced a return of the severe headaches and a shaking on the entire left side of her body. She was unable to stand erect. As a result, in September of 1967, over two years after the accident and nearly a year after the operation, she consulted Dr. Matthew Powell, a general practictioner close to her home.

When Dr. Powell first saw Mrs. Fritsche on September 12, she told him she was unable to do any work and had cramps in the neck and headaches; she had occasionally dragged her left foot and exhibited other neurological symptoms on her left side. He diagnosed her condition as "a neuritis or * * * compression of the cord, following

post cervical laminectomy, * * * a residual type of disease." She also had cervical radiculitis — an inflammation of the spinal nerve roots — and exhibited signs of severe depression because of her prolonged illness.

Dr. Powell prescribed a cervical collar, and medications to relieve her pain. The collar afforded some relief but could be worn only intermittently because of the sores it caused on Mrs. Fritsche's shoulders and neck. On later visits he injected pain killers into her neck. Mrs. Fritsche showed some improvement although Dr. Powell did not believe it was entirely satisfactory; she continued to have weakness of the left arm and numbness in her left thigh extending down to her knee. Dr. Powell continued to treat her up to the time of trial. On the last visit on March 7, 1968, he described her condition as follows: "Her neck when I took the collar off there was obviously a tremor to the musculature of the neck. The general physicial condition other than that remained the same. The straight-leg raising was only about three-quarters of the range on the right and one-quarter of the range of normal on the left."

Dr. Powell's diagnosis was "that of post cervical laminectomy with periphery muscle loss and weakness; cervical radiculitis and neuropathy; anxiety, depressive state and cervical osteo-arthritis." He stated that he did not know of any different treatment he could give Mrs. Fritsche although he believed she would require future care and would need to wear the collar for at least another year. He did not think another myelogram would be beneficial because of her emotional state. Finally, he said that Mrs. Fritsche would never be completely cured. He noted that there was a muscle loss which could never be replaced, and because of this loss, she could never again perform all of the activities she did before the accident. He added that she had gained a great deal of weight because of her inactivity and anxiety.

As she had started to improve, Mrs. Fritsche had resumed bowling, but to a much lesser extent than prior to the opera-

tion. Dr. Powell encouraged this activity as a form of therapy.

The defendants' two medical experts testified primarily on the issue of proximate cause. Dr. Glass believed that any connection between Mrs. Fritsche's operation and the accident was speculative. He conceded that when he examined her over a year after the operation she still exhibited soreness and muscle spasms, and limitations to the movement of her left leg. Dr. Spradley, defendants' other expert, testified that the accident only hastened the operation on Mrs. Fritsche's neck, and that the operation was inevitable because of her osteoarthritis. It was his opinion that she would suffer a great deal in the future, but that her pain would be caused by osteoarthritis rather than the accident.

Mrs. Fritsche testified that at the time of the trial she felt "rather rotten" physically and mentally, and that the left side of her body, below her waist, was frequently numb and that she had a return of her earlier shaking symptoms. She was required to take muscle relaxants and several other medications every day. She said that she was forced to curtail her housework and other activities, and that her husband and daughter had taken over most of these chores. She added that she had become short-tempered and "rather nasty." Mr. Fritsche and a daughter, Janet, substantiated Mrs. Fritsche's testimony concerning her changed condition. Mr. Fritsche said that his wife was limited in her ability to get around and walk. She could not sit still for long periods and she tired easily. She no longer did the cooking and was short-tempered. Janet testified that her mother was not the same person as before the accident; she "is more serious about everything."

The medical bills to the time of the trial total about $2,000, and it appears clear that treatments and medications will be required for an indefinite time in the future — perhaps for the rest of Mrs. Fritsche's life.

Taking all of this evidence into consideration along with the jury's determination that the accident was the proxi-

mate cause of Mrs. Fritsche's past difficulties and of her future pain and disabilities, we are unable to say that the jury's verdict was a "manifest denial of justice" within the meaning of *R. R.* 4:61–1(a), now *R.* 4:49–1(a).[1] See *Dolson v. Anastasia,* 55 *N. J.* 2 (1969). A trial court should not overturn a jury's verdict unless "it clearly appears that there was a manifest denial of justice under the law." *Id.* at 7. An appellate court is unable to get the "feel of the case" and lacks the opportunity to observe and hear the witnesses who appear before the trial judge and jury. Therefore, since its scope of review has these inherent limitations, an appellate court must make allowance for factors which were evident to the trial court and jury but which cannot be gleaned from the written record. *Id.* See *R.* 2:10–1. While the verdicts in the present case may appear to be high, we, as was true of the trial judge, cannot say that the defendants were denied justice. Verdicts should be upset for excessiveness only in clear cases. In the present case, Mrs. Fritsche was healthy and active before the accident. Since that event she has suffered continuing pain, undergone a major operation on her spine, and has lost the ability to do much of what she could do before. Moreover, the jury was warranted in believing that her condition, both physical and mental, could never be restored, and that she would suffer for the rest of her life, which was actuarily predicted to be over forty years. We do not believe that, in these circumstances, the jury's verdicts should be disturbed.

We think it deserving of mention that in the future both trial and appellate courts that are confronted with excessive verdicts should, if possible, resort to an order of

---

[1] The case was tried under *R. R.* 4:61–1(a) which provided that a jury's verdict should not be disturbed unless it "was the result of mistake, partiality, prejudice or passion." The new rule, *R.* 4:49–1(a) substitutes instead as the standard for decision "a manifest denial of justice under the law." Although the language of the rules differ, the standard to be applied is the same.

*remittitur.* See *Ekalo v. Constructive Service Corp. of America,* 46 *N. J.* 82, 93 (1965). Utilization of this device avoids the unnecessary expense and delay of a new trial.

We agree with the Appellate Division that defendants' claims of trial error are unsubstantial.

For the reasons set forth above, the judgment of the Appellate Division is reversed, and the judgment of the trial court entered pursuant to the jury's verdicts is reinstated.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.