962 A.2d 503

TIFFANY N. JASTRAM, BY HER GUARDIAN AD LITEM, DIANE JASTRAM AND DIANE JASTRAM, INDIVIDUALLY, PLAIN-TIFF–APPELLANT, v. SCOTT M. KRUSE, DEFENDANT–RE-SPONDENT.

Argued October 7, 2008—Decided December 23, 2008.

*Michael J. Hanus* argued the cause for appellant (*Gill & Chamas*, attorneys).

*John C. Prindiville* argued the cause for respondent (*Barry & Prindiville*, attorneys).

Justice LONG delivered the opinion of the Court.

At issue in this appeal is the propriety of an appellate panel's remission of a jury verdict from $500,000 to $50,000 after the trial judge, who had presided over the case, had ruled that the verdict was supported by the evidence and that it did not shock his conscience. We have concluded that the Appellate Division overstepped its bounds in this matter and accordingly reverse and remand for the reinstatement of the judgment entered upon the jury verdict.

## I.

On September 16, 2002, Diane Jastram, individually and as guardian ad litem of her daughter, Tiffany, filed a complaint claiming that defendant Scott Kruse negligently operated his automobile and caused Tiffany to suffer "serious and permanent personal injuries." [1]

At trial, the following facts were established: [2] On January 16, 2002, seventeen-year-old Tiffany was injured in an automobile accident when the car she was driving was struck by a vehicle

---

[1] Tiffany's claim is not subject to the verbal threshold, *N.J.S.A.* 39:6A–8(a), nor does she contend that her injury resulted in economic loss.

[2] In reviewing an award for excessiveness, the trial record must be reviewed in the light most favorable to the plaintiff. *See Johnson v. Scaccetti,* 192 *N.J.* 256, 281, 927 *A.*2d 1269 (2007).

driven by defendant Scott Kruse. There are no liability issues in the case and thus there is no need to detail the happening of the accident, except to say that Kruse was traveling at less than thirty miles per hour, that Tiffany was wearing her seat belt at impact, and that the collision caused her to be thrust forward against the restraining device, and then back into her seat.

At the scene, Tiffany told police that she was not injured or in pain. She then dropped her mother off and went out with a friend to celebrate her birthday as planned. She cut the evening short because she "was shaken up and . . . wanted to go home." That evening, Tiffany had a muscle spasm in her back and pains in her legs. She reported that pain to her mother.

She continued to suffer back pain and stiffness in the days following the accident, but did not seek professional medical treatment immediately, because she hoped that her pain and spasms would ebb naturally.[3] Tiffany self-treated with pain relievers and heating pads. Although she attended school after the accident, she testified to sporadic absences because of pain and to suffering pain and stiffness while in school. When the pain persisted for two weeks after the accident, Tiffany consulted Dr. Hausmann, an orthopedic surgeon. Tiffany complained that she had pain originating in her back that radiated down her left leg and left foot, that she was having trouble sleeping, and that she "was generally uncomfortable." X-rays were negative, and Dr. Hausmann did not perceive any structural damage. He prescribed anti-inflammatories and painkillers.

The medications alleviated the pain for a time, but it returned on completion of the prescriptions. Tiffany then consulted Dr. Grossman, a chiropractor. He prescribed three chiropractic sessions a week to adjust Tiffany's spine to relieve the tension. Dr. Grossman also ordered an MRI, which did not reveal structural damage to the spinal discs.

---

[3] She had never had back pain prior to the accident, and she has not been involved in any accidents subsequent to the collision with Kruse.

Tiffany's chiropractic treatment consisted of approximately nineteen visits and concluded on May 3, 2002. At Dr. Grossman's recommendation, she consulted Dr. Del Valle, a pain medicine and rehabilitation physician, on April 29, 2002, complaining of lower back pain and back spasms that caused pain to radiate down through her left leg. She reported that the pain in her left foot had lessened. Dr. Del Valle recommended trigger-point injections, which Tiffany declined because she was afraid of the two-and-one-half to three-inch needles and because Dr. Del Valle could not guarantee that the injections would reduce the pain.

On December 3, 2003, Tiffany consulted Dr. Caponetti, an orthopedic surgeon. After his examination, Dr. Caponetti recommended physical therapy consisting of "[s]tretching exercises." The exercises provided marginal relief, and Tiffany still suffered back spasms and back pain. Further, because the exercises performed during physical therapy largely mirrored the home-exercise program that Tiffany had been following on the advice of Dr. Grossman, she stopped attending physical therapy after three sessions.

Tiffany testified that she had continuous, daily pain from the date of the accident up through the date of trial, which she treated using over-the-counter pain medication. She acknowledged that, on "good days," she can perform some activities, but that "[o]n a bad day, it's constant back spasms," causing pain in her legs that prevents her from walking or "be[ing] too active because everything hurts."

Tiffany provided detailed testimony about the impact that her injury had on her lifestyle. She had taken up horseback riding at the age of eight or nine and it became "her passion" and her only avocation. She kept to a regular riding routine at Hidden Hollow Farm (the Farm), where she worked in exchange for riding privileges, training young horses, mucking out stalls, moving objects in wheelbarrows, and carrying water buckets. Over time, as her equestrian capacities progressed, Tiffany began to ride

competitively, participating annually in approximately 120 riding events in approximately thirty separate competitions.

After the accident, Tiffany could neither lift heavy objects at the Farm nor partake in "her passion" for horseback riding. She had difficulty lifting her leg to mount the horses, and when she was able to mount, the physical stress of riding generated too much pain for her to bear. She no longer rides.

The impact on Tiffany's life was not confined to the termination of her athletic participation as an equestrienne. At the time of trial, she still could not sleep continuously through the night. She testified that she attempts to alleviate the discomfort by sleeping with a pillow between her legs, but usually only can sleep for two to three uninterrupted hours before she is awakened by stiffness and spasmodic pain. Indeed, her mother testified that she routinely enters Tiffany's room at night after awakening to the sound of her daughter crying and tries to reduce Tiffany's pain by massaging her back. The mother also testified that sometimes she "could actually see [her back] muscle moving."

Tiffany's back pain caused other changes to her personal life. She no longer can "go out dancing" with her young friends because she cannot stand for long periods of time. She has to be seated because, after approximately thirty minutes of standing continuously, she begins to experience "pain" and "spasms." Additionally, although prior to the accident, Tiffany and her mother often would spend "personal time" at the gym, doing cardiovascular exercises, she cannot bear the physical stress that accompanies those exercises.

Tiffany always helped around the house but can no longer do so. Although she can perform light activities, such as making her bed and ironing, she cannot undertake many of the chores that she used to perform—including carrying the laundry, cleaning, sweeping, and yard work—because of her back pain. She continues attending school, but she has to stand and stretch "every once in a while" because sitting for long periods of time makes her stiff.

When she was asked to assess her general well-being, she responded, "I feel old sometimes."

Tiffany continued to work as a hostess at the Navesink Fishery after the accident, because she wanted to help her divorced mother support the family (she had worked since she was in the eighth grade). Her duties included seating the patrons and ensuring that the wait staff was assigned properly. She left that job to take a waitress position at a restaurant, where she served lunches about three days each week. That employment lasted only a few months. She presently works full-time at the Due Process Stables as a "manager," doing "mostly paperwork."

Dr. Robert Dennis, a board-certified orthopedist who examined Tiffany and reviewed her medical records, including reports from the x-rays and the MRI, offered expert testimony about the nature and extent of her injuries. Dr. Dennis opined that Tiffany sustained a "[s]ignificant ligamentous injury [to her] lumbar spine and damage to the spinal column which has produced lumbar spinal instability":

[A.]: When a force such as a motor vehicle accident pushes the body into a forced extension and a[ ] flexion, forward and back, each of those structures in a sequence are pushed to their limits. If the force is greater than the limits of the muscle to restrain the motion in the first area that gets damaged in a permanent way is the muscle.

Q. Doctor, is that, in your opinion, within a reasonable degree of medical certainty, is that what happened to Tiffany Jastram?

A. Definitely. And more.

Dr. Dennis further addressed the severity and permanency of Tiffany's injuries:

Q. [D]id [Tiffany] sustain a sprain and strain as a result of this motor vehicle accident?

A. Well, to use those words in common language, we try to—we tend to underplay what I think occurred here, because when I saw her three years later, she still had positive findings. So, therefore, it's important to understand that sprains and strains, as we've described, come as mild, minimal, mild, moderate, and severe. The severe strains and sprains of the tissues, muscles and ligaments[ ] leave scar tissue. A lot of scar tissue.

Dr. Dennis described Tiffany as having "somewhere in between moderate to severe ligament injuries and muscle permanent inju-

ries with scarring from this injury." According to Dr. Dennis, the scar tissue—tissue that "is no longer flexible"—that formed "cause[d] . . . the loss of the protection of the spine that we [would] normally have if the[ ] tissues were not . . . damaged." As a result, Tiffany has sustained "a permanent loss of function of the back." When asked for her prognosis, Dr. Dennis responded that Tiffany's injuries are "permanent in nature," that they "got [as] better as they're going to get," and that the "scar tissue will not allow her to ever return to her pre-injury state." Dr. Dennis concluded by acknowledging that the limitations on Tiffany's lifestyle to which she testified were wholly consistent with the type of "permanent" injury she had suffered.

In response to Dr. Dennis's testimony, Kruse produced the expert testimony of Dr. Jay Bruce Bosniak, an orthopedic surgeon. Dr. Bosniak examined Tiffany and reviewed her x-rays which, he testified, revealed "normal spine alignment . . . without evidence of any kind of acute or chronic . . . bone damage." He opined that Tiffany might be suffering from spondylolisthesis—a condition in which one vertebra slides over the vertebra below it— but stated that that condition "would not have been traumatically induced." Dr. Bosniak concluded,

> My prognosis . . . based on what I've found, [is] that as a result of the injuries incurred in the 1/16/02 accident, the patient's orthopedic prognosis could best be described as very good to excellent. I felt that way because I couldn't find any objective signs of physical abnormalities on my examination that I could directly attribute to the accident in question.
>
> . . . .
>
> I didn't think there was any indication for any additional formal treatment because of [Tiffany's] accident[.]

On cross-examination, Dr. Bosniak agreed that Tiffany suffered a lumbar sprain. Thus, his sole point of disagreement with Dr. Dennis related to permanency. Dr. Bosniak acknowledged that he recommended further treatment—yoga or aquatic therapy—to improve Tiffany's condition. He also acknowledged that an individual suffering from a lumbar sprain may find difficulty performing the types of activities that Tiffany testified that she could no longer engage in. Finally, Dr. Bosniak conceded that when scar

tissue forms after the overstretching of a muscle, that scar tissue can be permanent.

At the conclusion of trial, the jury returned a unanimous verdict declaring that Kruse was 100% negligent, that that negligence proximately caused Tiffany's injuries, and that she was entitled to an award of $500,000 in damages.

Kruse filed a motion for new trial. In rendering a decision, the trial judge began from the premise that setting aside a jury award "is the exception, not the rule." He upheld the award, stating:

> It's clear from [the jury's] decision they weren't impressed [with Dr. Bosniak]. They bought Dr. Dennis. And this was a toss up. If they buy Dr. Bosniak's position, does the plaintiff get an award? Yes, she does. It was a no threshold case. She's going to get an award. But Bosniak said but I don't think there's permanency here. Dennis said, no I think there is permanency. [The jury's] call. Their call.[4]

The judge also focused on Tiffany's youth and her estimated lengthy lifespan, stating that "[t]he time unit rule was a very devastating argument in this case." He stated,

> And I charged them, I'm not telling you what to decide. I am not allowed to give you—this would make this job a whole lot easier if personal injury was reduced to the same standard as Workers Comp is. Here's your table. It tells you what a thumb is worth, a nose is worth, two toes, half of a foot and everything else. Go in, figure out what the law says. Come back here and tell me, we'll work it up on the table. And we'll give the plaintiff an award. It doesn't work that way.
>
> This is an extremely imperfect science that we all practice. And the motions that I get for a new trial are the epitome of the imperfection of this practice. And I will tell you right now. Does this verdict shock the conscience? It does not. Was I surprised at the verdict? Yes. Did I think it was going to be that high? No, I didn't. Was there testimony in the record to support this verdict? Yes, there was. Does the time unit rule support the computation by the jury? It certainly does. The jury had every right in the world to disregard all the plaintiff's proof. They elected not to do so, and I am not going to disturb their verdict.

Kruse appealed, and, in an unpublished opinion, a two-judge panel of the Appellate Division reversed, based on its conclusion that the verdict was clearly and shockingly excessive. As a result, the panel remitted the damage award to $50,000 plus prejudgment

---

4 The trial judge commented that the testimony in this case "was not one of Dr. Bosniak's finer days."

interest, and gave Tiffany the option of accepting the remitted verdict, or suffering a new damages trial. We granted Tiffany's petition for certification, 194 *N.J.* 268, 944 *A.*2d 29 (2008), and stayed any further trial proceedings.

## II.

In her petition, Tiffany argues that the evidence supported the verdict; that the verdict did not shock the conscience; that the Appellate Division erred in failing to defer to the trial judge's "feel of the case" and in considering her offer for judgment; that the Appellate Division's comparison of her verdict to other verdicts was flawed; and that even if the award was excessive, the matter should have been remanded to the trial judge for the remittitur proceeding.

Kruse counters that the remittitur from $500,000 to $50,000 was warranted, considering that similar cases have been resolved at the remitted number; none of Tiffany's treating physicians restricted her activities; her medical tests showed no objective evidence of injury to the lumbar spine; Dr. Dennis's testimony was countered by that of Dr. Bosniak, who opined that Tiffany did not sustain a permanent injury; the appellate panel "was fully cognizant of both [Tiffany's] age and the permanency opinion offered by [Dr. Dennis]" when reaching its conclusion that the $500,000 award was excessive; and even if the offer of judgment should not have been considered, the appellate panel's determination can be sustained based on its other conclusions.

## III.

Because Kruse has not cross-petitioned from the denial of a new trial and has apparently abandoned the claims of trial error that he raised below, the sole issue before us involves the quantum

of damages and remittitur.[5] Remittitur

describes the power of a court upon a motion for a new trial due to excessive damages rendered by a jury to require the plaintiff to consent to a decrease in the award to a specified amount as a condition for denial of the motion. In other words, remittitur denies a defendant a new trial if a plaintiff consents to a specified reduction in the jury award.

[*Fertile v. St. Michael's Med. Ctr.*, 169 *N.J.* 481, 491, 779 *A.2d* 1078 (2001) (citations and internal quotation marks omitted).]

Our role in assessing a jury verdict for excessiveness is to assure that compensatory damages awarded to a plaintiff "encompass no more than the amount that will make the plaintiff whole, that is, the actual loss." *Caldwell v. Haynes*, 136 *N.J.* 422, 433, 643 *A.2d* 564 (1994) (citing *Ruff v. Weintraub*, 105 *N.J.* 233, 238, 519 *A.2d* 1384 (1987)). Although "[t]he judicial role in reviewing jury verdicts ... is essential to a rational system of justice," the authority to set aside damages awards on grounds of excessiveness is "limited." *Carey v. Lovett*, 132 *N.J.* 44, 66, 622 *A.2d* 1279 (1993). "Verdicts should be upset for excessiveness only in clear cases." *Fritsche v. Westinghouse Elec. Corp.*, 55 *N.J.* 322, 330, 261 *A.2d* 657 (1970). "It is only upon the predicate of a determination that there has been a manifest miscarriage of justice, that corrective judicial action is warranted." *Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 598, 379 *A.2d* 225 (1977). Recently, in *Johnson v. Scaccetti,* supra, Justice Albin, writing for the Court, explained the basis for that approach:

Our civil system of justice places trust in ordinary men and women of varying experiences and backgrounds, who serve as jurors, to render judgments concerning liability and damages. Determining just compensation for an accident victim, particularly when the damages are not susceptible to scientific precision, as in the case of pain and suffering damages, necessarily requires a high degree of discretion. That is so because there is no neat formula for translating pain and suffering into monetary compensation. Although the "measure of damages is what a reasonable person would consider to be adequate and just under all the circumstances," reasonable people may differ on what is fair compensation in any particular case. The "reasonable person" standard, however objective it might be,

---

[5] We note that the Appellate Division rejected Kruse's trial error claim in respect of plaintiff's summation, a ruling with which we are in concert. The court declared moot Kruse's argument regarding the admission of the anatomical diagrams into evidence because of its ruling on remittitur. We have independently evaluated that issue and concluded that it is without merit.

can be illusory. Our model jury instructions on pain and suffering recognize the inherently subjective nature of the damage-calculating process. Those instructions inform jurors that:

> The law does not provide you with any table, schedule or formula by which a person's pain and suffering disability, loss of enjoyment of life may be measured in terms of money. The amount is left to your sound discretion .... You each know from your common experience the nature of pain and suffering, disability, impairment and loss of enjoyment of life and you also know the nature and function of money. The task of equating the two so as to arrive at a fair and reasonable award of damages requires a high order of human judgment. For this reason, the law can provide no better yardstick for your guidance than your own impartial judgment and experience.

[192 *N.J.* at 279–80, 927 *A.*2d 1269 (citations omitted).]

■ In other words, the evaluation of damages is a matter uniquely reposed in the jury's good judgment, and to justify judicial interference, "[t]he verdict must be 'wide of the mark' and pervaded by a sense of 'wrongness.' " *Id.* at 281, 927 *A.*2d 1269 (quoting *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)); *see also Carrino v. Novotny,* 78 *N.J.* 355, 360–61, 396 *A.*2d 561 (1979) (discussing importance of reversing jury verdicts only when necessary to avoid "a plain miscarriage of justice").

■ In analyzing whether a damages award is excessive, a trial judge's review must be grounded substantially in the "totality of the evidence" in the record, *Baxter, supra,* 74 *N.J.* at 598, 379 *A.*2d 225, which is viewed in a light most favorable to the plaintiff. *Johnson, supra,* 192 *N.J.* at 281, 927 *A.*2d 1269 (citing *Taweel v. Starn's Shoprite Supermarket,* 58 *N.J.* 227, 236, 276 *A.*2d 861 (1971), *overruled on other grounds by Fertile, supra,* 169 *N.J.* 481, 779 *A.*2d 1078); *Bell Atl. Network Servs., Inc. v. P.M. Video Corp.,* 322 *N.J.Super.* 74, 83, 730 *A.*2d 406 (App.Div.), *certif. denied,* 162 *N.J.* 130, 741 *A.*2d 98 (1999). In particular, the judge is to evaluate the nature and extent of the injury, the medical treatment that the plaintiff underwent and may be required to undergo in the future, the impact of the injury on the plaintiff's life from the date of injury through the date of trial, and the projected impact of the injury on the plaintiff in the future. The court may look beyond the record to judicial "experience with other injury verdicts." *Fertile, supra,* 169 *N.J.* at 501, 779 *A.*2d 1078. However, "if it does so, it must give a factual analysis of how the award is

different or similar to others to which it is compared." *Johnson, supra,* 192 *N.J.* at 281, 927 *A.*2d 1269.

So analyzed, where an award, "[ ]even if generous[,] has reasonable support in the record, the jury's evaluation should be regarded as final." *Taweel, supra,* 58 *N.J.* at 236, 276 *A.*2d 861 (citing *Fritsche, supra,* 55 *N.J.* 322, 261 *A.*2d 657). In short,

> [An award] should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice. The process of "weighing" the evidence is not to encourage the judge to "evaluate the evidence as would a jury to ascertain in whose favor the evidence preponderates" and on that basis to decide upon disruption of the jury's finding. "[T]he judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a thirteenth and decisive juror." Nevertheless, the process of evidence evaluation called "weighing" is not "a *pro forma* exercise, but calls for a high degree of conscientious effort and diligent scrutiny. The object is to correct clear error or mistake by the jury."
>
> [*Baxter, supra,* 74 *N.J.* at 597–98, 379 *A.*2d 225 (citations omitted).]

Further, under *Rule* 2:10–1, an appellate court only can reverse a trial judge's decision to deny a motion for new trial where "it clearly appears that there was a miscarriage of justice under the law." That inquiry requires employing a standard of review substantially similar to that used at the trial level, except that the appellate court must afford "due deference" to the trial court's " 'feel of the case,' " with regard to the assessment of intangibles, such as witness credibility. *Feldman v. Lederle Labs.,* 97 *N.J.* 429, 463, 479 *A.*2d 374 (1984).

The "feel of the case" is not just an empty shibboleth—it is the trial judge who sees and hears the witnesses and the attorneys, and who has a first-hand opportunity to assess their believability and their effect on the jury. It is the judge who sees the jurors wince, weep, snicker, avert their eyes, or shake their heads in disbelief. Those personal observations of all of the players is "the feel of the case" to which an appellate court defers. Obviously, insofar as the trial judge's decision rests on " 'determination[s] as to worth, plausibility, consistency or other tangible

considerations apparent from the face of the record,' " an appellate court need not defer. *Caldwell, supra,* 136 *N.J.* at 432, 643 *A.*2d 564 (quoting *Dolson v. Anastasia,* 55 *N.J.* 2, 7, 258 *A.*2d 706 (1969)).

Where the jury's verdict regarding liability is supported by the record, but the damages award is excessive, courts are encouraged to invoke remittitur to avoid a new trial. *Taweel, supra,* 58 *N.J.* at 231, 276 *A.*2d 861. A court utilizing remittitur should "remit[ ] the award to the highest figure that could be supported by the evidence" because "the process of remittitur is essentially to 'lop-off' excess verdict amounts, and not to substitute the court's [judgment] for that of the jury." *Fertile, supra,* 169 *N.J.* at 500, 779 *A.*2d 1078 (citation omitted).

## IV.

Applying those standards, we are satisfied that the Appellate Division was wide of the mark in its assessment of the verdict. In support of its decision to remit, the Appellate Division relied on the following: that Tiffany did not see a health care provider until two weeks after the accident; that she received only sporadic treatment; that she had no bone injuries and that her spasms were "unquantified"; that her doctors did not restrict her activities; that she might not have satisfied the "objective proof" standard had AICRA applied; that the case is indistinct from "garden-variety lumbar strain and sprain" cases that settle for sums well under $50,000; that the verdict compared unfavorably to several specific verdicts to which the court adverted; and that Tiffany made a $12,500 offer of judgment under *Rule* 4:58–1 reflecting her assessment of the case. We will address these contentions serially.

Despite acknowledging that the evidence had to be viewed in a light most favorable to Tiffany, the Appellate Division instead viewed her case in a negative light and, in so doing, violated the precept of *Baxter* that it not sit as a thirteenth juror. To the contrary, the trial judge concluded that the jury believed Tiffany's

evidence and recognized that, if believed, that evidence supported the verdict. Recapping, Tiffany did not seek professional treatment immediately after the accident because she optimistically but erroneously hoped the pain would go away. She subsequently consulted many doctors to relieve her pain and spasms, to no avail. Dr. Dennis stated that lumbar injuries range from "minimal" to "severe" and that Tiffany suffered a "moderate to severe" injury. He described what happened to Tiffany as a "[s]ignificant ligamentous injury [to her] lumbar spine and damage to the spinal column which has produced lumbar spine instability" that was entirely consistent with the limitations on Tiffany's life to which she testified. He also stated that her condition was "permanent," had improved as much as it ever would, and would continue to inhibit her life in the future as in the present.

Tiffany, in turn, testified regarding what she lost as a result of her injury. First in that category was her ability to ride horses—a "passion" to which she devoted herself and that she sacrificed for and worked to pursue from the time she was eight or nine years old. She cannot go dancing with her friends, exercise, or even help much with the household chores. She also testified, as did her mother, to continuing chronic pain that makes her unable to sleep through the night. She was seventeen years old at the time of the accident and had a projected life expectancy of fifty-five more years. That evidence was what the trial judge, who saw and heard the witnesses, was referring to when he said there "was testimony in the record" to support the verdict and that it did not shock his conscience.

The fact that Tiffany did not suffer a bone injury is of no moment to an assessment of what she did suffer, especially when no bone injury was claimed. The same is true of the absence of quantification. Dr. Dennis was not required to say more than what he did—that his examination revealed that Tiffany's "significant ligamentous injury" was "permanent" and "moderate to severe." As the trial judge noted, the jury believed Dr. Dennis and not Dr. Bosniak. The absence of quantification testimony by

Dr. Dennis was simply not a basis for the Appellate Division to refuse to accord deference to the jury's credibility evaluation.

Likewise, the panel erred in relying on the fact that had the verbal threshold, *N.J.S.A.* 39:6A–8(a), governed this action, Tiffany might not have overcome summary judgment because she could not objectively demonstrate "permanency." Whether that is so is unclear. But even if it is so, the limited definition of "permanency" employed by *N.J.S.A.* 39:6A–8(a) was drafted to serve a specific public policy that is not at issue in this case. Thus, the outcome of this matter under AICRA is of no moment to its disposition pursuant to applicable legal principles.

The Appellate Division was incorrect as well in citing the $12,500 offer of judgment as "reflecting Tiffany's assessment of a reasonable settlement." To further our strong policy favoring settlements, *Young v. Latta*, 123 *N.J.* 584, 590, 589 *A.*2d 1020 (1991), *Rule* 4:58–1(b) requires that offers of judgment that are not accepted prior to trial "be deemed withdrawn," and that evidence of the offer "shall not be admissible except in a proceeding after the trial to fix costs, interest, and attorney's fee." In a similar vein, *N.J.R.E.* 408 prohibits the admission of settlement offers or statements during settlement negotiations as evidence of "liability for, or invalidity of, or amount of [a] disputed claim."

 Kruse argues that those rules only apply "in front of a jury." Not so. Parties need to know that the things they say and do in attempting to negotiate a settlement will not be used against them in *any* later proceedings. That includes an offer under *Rule* 4:58–1, which limits the admission of the offer to proceedings after trial for "costs, interest, and attorney's fee." Most importantly, a pre-trial settlement offer is entirely irrelevant in a remittitur case in which the fundamental inquiry is not what anyone thought the case was worth beforehand, but whether the jury could have reached the verdict on the evidence actually before it.

The panel's opinion also rests on its analogy to awards rendered in other cases. That, in itself, is appropriate. *See Fertile, supra,*

169 *N.J.* at 501, 779 *A.*2d 1078 (recognizing that reviewing courts may consider "experience with other injury verdicts" when evaluating excessiveness of damages award). However, the panel here generally referenced "thousands of garden-variety lumbar strains and sprains that pass through our courts every year" that settle for under $50,000. That was improper. The value of a benchmark necessarily must be qualified by measuring the "totality of the evidence" on a case-by-case basis. *See Baxter, supra,* 74 *N.J.* at 598, 379 *A.*2d 225. As we said in *Johnson,* the court "must give a factual analysis of how the award is different or similar to others to which it is compared." 192 *N.J.* at 281, 927 *A.*2d 1269. In short, the Appellate Division's reference to "thousands of garden-variety lumbar strains and sprains" was wide of the mark.

To be sure, the panel mentioned several specific cases earlier in its opinion to which it apparently compared this one. *Hinojo v. N.J. Mfrs. Ins. Co.,* 353 *N.J.Super.* 261, 802 *A.*2d 551 (App.Div.), *certif. denied,* 175 *N.J.* 76, 812 *A.*2d 1109 (2002); *Conrad v. Robbi,* 341 *N.J.Super.* 424, 775 *A.*2d 562 (App.Div.), *certif. denied,* 170 *N.J.* 210, 785 *A.*2d 438 (2001); *Henker v. Preybylowski,* 216 *N.J.Super.* 513, 524 *A.*2d 455 (App.Div.1987). In *Henker, supra,* the sole reference to the facts was that the plaintiff suffered a "permanent soft tissue injury." 216 *N.J.Super.* at 516, 524 *A.*2d 455. Thus, there is simply nothing to compare with this case. In *Hinojo, supra,* the plaintiff, in his mid-thirties, was awarded $675,000 for the amputation of his pinky. The *Hinojo* panel held that the trial judge did not err in remitting the award to $400,000. 353 *N.J.Super.* at 278–79, 802 *A.*2d 551. Although the injury was "very serious" and the plaintiff's forty-year life expectancy "militate[d] toward[ ] the award of a substantial amount," the $675,000 award was held excessive because the plaintiff was able to return to work and, most importantly, because medical treatment yielded a "good result" that minimized the degree to which the plaintiff was inhibited. *Ibid.* Those facts are entirely distinct from the facts at bar insofar as Hinojo achieved a good outcome and Tiffany did not.

The court's citation to *Conrad, supra*, is likewise unavailing. The panel there agreed with the trial judge that a $750,000 award was not excessive where the plaintiff, who was sixteen years old at time of injury, suffered a fracture that required surgery and physical therapy, and testimony revealed that the injury was permanent, would cause future discomfort, and impacted the plaintiff's lifestyle. 341 *N.J.Super.* at 444, 775 *A.*2d 562. Yet, the Appellate Division here did not point out that Conrad's verdict was a full 50% greater than Tiffany's and reflects, as does this verdict, that the injury substantially impacted the plaintiff's life.

In the final analysis, in suggesting that *Henker, Hinojo*, and *Conrad* somehow support its determination to remit Tiffany's verdict by 90%, the appellate panel compared the worst aspects of the comparison cases to the best aspects of Tiffany's case, again failing to give Tiffany the benefit of all the evidence and inferences available to her. Moreover, we note that in *Hinojo* and *Conrad,* the appellate panel deferred to the judgment of the trial court. Although paying lip service to respecting the trial judge's "feel of the case," the panel here did not acknowledge that that factor favors upholding the award. *See Carrino, supra*, 78 *N.J.* at 361, 396 *A.*2d 561 (noting that where trial court refuses to disrupt damages award, "feel of the case" factor favors upholding award on appeal).

Here, the Appellate Division essentially reweighed the evidence and substituted its judgment for that of the jury and the trial judge, without warrant to do so. To be sure, as the trial judge observed, this was a high verdict, but that does not mean it was excessive. *See Johnson, supra*, 192 *N.J.* at 283, 927 *A.*2d 1269. If there was evidence from which a rational jury could have reached the verdict, it should be upheld. The trial judge correctly concluded that there was, and that conclusion is entitled to deference.

V.

The judgment of the Appellate Division is reversed. The jury verdict is reinstated.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.