**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4497-18

GRAPHNET, INC.,

      Plaintiff-Appellant,

v.

RETARUS, INC.,

      Defendant-Respondent.

_____

Submitted February 26, 2020 – Decided February 11, 2021

Before Judges Fuentes, Mayer and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3298-16.

FisherBroyles, LLP, attorneys for appellant (Joseph Schramm, III, on the briefs).

Alston & Bird, LLP, attorneys for respondent (Karl Geercken and Steven L. Penaro, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

This appeal concerns a defamation action filed by plaintiff Graphnet, Inc., against defendant Retarus, Inc.  In  his opening statement to the jury, plaintiff's counsel described Graphnet as "the leading global provider of Cloud-based fax messaging services and business integration services."  Retarus contracts with telephone service carriers like Verizon to obtain "direct in dial" (DID) phone numbers.  This service allows customers to send and receive thousands of faxes simultaneously without receiving a "busy" signal.

Plaintiff claimed defendant made defamatory statements in a training pamphlet it circulated to potential customers at a May 2016 expo event.  Plaintiff alleged it lost customers and revenue due to these defamatory pamphlets.  Through pretrial motion practice, defendant whittled down plaintiff's original ten-count complaint to two counts: defamation/slander (count one) and violations of the Telecommunications Act (TCA), 47 U.S.C. §§201 -231, and Federal Communication Commission (FCC) regulations, 47 C.F.R. §64.1120.

Plaintiff tried its case before a civil jury over five days, commencing on January 30, 2019, and ending on February 5, 2019.  The trial judge dismissed plaintiff's TCA and FCC claims on February 4, 2019, leaving only the defamation and slander claims to the jury.  The jury found defendant liable and awarded plaintiff $800,000 in "nominal damages."  In response, defendant filed

A-4497-18

a motion for remittitur or, alternatively, for a new jury trial limited to a determination of "nominal damages."  The judge granted defendant's motion for remittitur and reduced the award of nominal damages to $500.

In this appeal, plaintiff argues the trial judge erred as a matter of law when she granted defendant's motion for remittitur and thereafter arbitrarily awarded $500 in nominal damages.  Defendant argues plaintiff did not prove it suffered any actual damages, nominal or otherwise.  We are satisfied the jury's award of $800,000 in "nominal damages" is shockingly excessive and cannot stand.  However, the trial judge's decision to award $500 as nominal damages over plaintiff's objection is legally untenable.  As our Supreme Court held in Cuevas v. Wentworth Group, when a court determines that a damages award cannot stand because it is so grossly excessive that it shocks the judicial conscience, plaintiff "has the choice either to accept the award as remitted by the court or to proceed with a new damages trial before another jury."  226 N.J. 480, 499 (2016).

Here, plaintiff did not consent to the judge's remittitur award of $500 in nominal damages.  We thus vacate the trial judge's order that unilaterally awarded plaintiff $500 and remand the matter for a new trial, limited to a

determination by a jury on the amount of nominal damages, if any, plaintiff is entitled to receive.

I

In this case, Graphnet claimed it was "the leading global provider of Cloud-based fax messaging services and business integration services." By contrast, plaintiff's counsel described defendant as a subsidiary of "a German company with its global headquarters located in Munich, Germany," and its principal place of business in the United States located in Secaucus. Thus, although defendant was the "big player in Germany and in Europe," plaintiff's counsel claimed it now "needed to get a foothold in the U.S. market."

Guy Conte was plaintiff's Vice Present, Chief Financial Officer, and Treasurer of the Board of Directors at the time this case came to trial. He testified there were "three major players" in 2010 located in the United States that provided cloud-based messaging service. According to Conte, Easylink and Xpedite were the other two companies that competed for the E-Fax Cloud messaging services in the North American market. After Easylink acquired Xpedite on or about 2011, there was only one other significant competitor in the U.S. market. Defendant did not formally enter the U.S. market until February 4, 2011. Defendant's press release, marked as an exhibit at trial, stated:

4

"Retarus, the leading European provider of professionally hosted messaging solutions, announces the expansion of its company division focused exclusively on the North American market."

In May of 2016, defendant attended an "expo event[,]" that attracted an important group of companies with an expressed interest in cloud-based messaging services. A number of plaintiff's employees attended the event and obtained a copy of an advertisement and training pamphlet that defendant circulated. Both pages of defendant's pamphlet had defendant's name at the top of the page and its copyright date at the bottom.

Tim Valentine was Retarus's Senior Vice President of Sales at at the time of trial. He testified that the "brochure"[1] at issue here originated from Retarus's marketing department. The brochure was an internal training tool to be used by sales associates to guide interactions with prospective clients. Valentine explained the brochure provided "sales professionals, especially new hires" with easily accessible information and "qualifying questions" designed to assist the sales staff to determine if a prospective client "is a potential fit for [defendant's]

---

[1] When this document was first marked at trial as an exhibit, the judge identified it for the record "as an ad and training pamphlet." We refer to it here as a "brochure" because that was how Valentine described it without objection.

services." Valentine characterized the brochure "an educational tool." He did not know whether the brochure was ever sent to prospective customers.

The training brochure identified plaintiff by name and included a section at the bottom of one page that described the "disadvantages" associated with plaintiff's services. It claimed that one particular disadvantage with Graphnet is a "[p]erceived difficulty with up-time," which measures a company's ability to send and receive faxes. The pamphlet also criticized plaintiff's security, disaster recovery, delivery quality, lack of international data centers, difficulty in providing global coverage, and its narrow focus on small clients. As Graphnet's representative, Conte refuted all of these alleged shortcomings.

According to Conte, Graphnet's relationship with some of its larger customers negatively changed after the May 2016 expo. He claimed that Graphnet's revenue stream from services provided to J.P. Morgan and Chase (Chase) decreased after the expo and eventually lost its status as a Chase "preferred vendor."[2] Conte testified that the services provided to Chase in 2014 generated over one million dollars in revenue. This revenue stream steadily

---

[2] According to Conte, preferred vendor status meant "that the customer relies heavily upon, has total confidence in, has been working with for a number of years[,] [h]as…the highest quality service and integrity."

A-4497-18

declined thereafter to approximately $800,000 in 2015; $300,000 in 2016; and $100,000 in 2017. Conte testified that plaintiff had not provided any services to Chase thereafter. Plaintiff also claimed that defendant's dissemination of the brochure in 2016 proximately caused GEICO, Morgan Stanley, Markit, and PR Newswire, to stop using its services altogether or significantly reduce their business activities.

However, the trial record also contains evidence that the decline in plaintiff's business was unrelated to defendant's brochure. Defendant argues that Graphnet conceded it received complaints from customers, including Chase, about its connectivity capabilities and customer support services. These problems were related to the damage caused by Superstorm Sandy in 2012, two years before defendant's 2014 brochure and four years before the May 2016 expo.

## II.

At the charge conference held pursuant to Rule 1:8-7(a), the parties agreed to utilize Model Jury Charge 8.46, which instructs the jury on elements of defamation. Specifically, Section A instructs the jury regarding general damages, Section B addresses compensatory damages, and Section D defines

7

nominal damages. The judge gave the jury the following instructions with respect to nominal damages:

> [Y]ou are permitted to award nominal damages to compensate the plaintiff for injury to reputation which you reasonably believe that may have been sustained. <u>Nominal damages are a small amount of money damages that are not designed to compensate a plaintiff</u>, but are awarded for the infraction of a legal right where the extent of the loss is not shown or where the right is one not dependent on the loss or damage.
>
> [(Emphasis added).]

Nominal damages awards

> may be made in a defamation case to a plaintiff who has not proved a compensable loss. Nominal damages are 'awarded for the infraction of a legal right, where the extent of the loss is not shown, or where the right is one not dependent upon loss or damage.' Such an award is a 'judicial declaration that the plaintiff's right has been violated.' It serves the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory statement.
>
> [<u>W.J.A. v. D.A</u>, 210 N.J. 229, 240-41 (2012), (internal citations omitted)]

The judge read the entire verdict sheet to the jury. With respect to the issue of nominal damages, the verdict sheet required the jury to answer the following question:

> In the event that you find that Graphnet is not entitled to actual damages, Graphnet may recover nominal

8

damages without proof of causation and without proof of actual harm for the publication of the defamatory statement to a third party other than Graphnet."

And then the question is:

> What is the amount of nominal damages Graphnet is entitled to compensate Graphnet for the injury to reputation which you reasonably believe is sustained?

In the course of deliberations, the jury sent the following relevant questions to the judge: (1) "How much money does Graphnet seek in damages?" and (2) "How do we come up with the amount?"  In response to the first question, the judge apprised the jurors that they had to rely on their "recollection of what [they had] heard during the course of the trial with regard to the damages that may have been testified to or the arguments of counsel."  With respect to the second question, the judge stated:

> Again,  . . . it is your review of any evidence and the testimony that you heard about damages, and then what you are to do is to come up with what you believe, if appropriate, a fair -- an amount, if appropriate, that is fair and reasonable.  Outside of that, I can't give you any more guidance than your own recollection of the testimony and intellect and experience with money. Everyone has had experience with money.

The jury continued to deliberate that day without reaching a verdict.  Deliberations resumed the following day.  The jury again sent a note to the judge

asking whether "we use cost of court and legal fees as part of the awarded damages." After a brief conference with counsel, the judge responded "that there is no claim for cost or damages in this complaint, so the answer to that would be no." The jury eventually reached a verdict later that day.

By a vote of six to zero, the jury found Graphnet proved, by a preponderance of the evidence, that: (1) Retarus's 2014 brochure contained a false statement about Graphnet; (2) Retarus was at fault for publishing the false statement; and (3) Retarus defamed Graphnet through the publication of the 2014 brochure to a third party other than Graphnet. On the question of damages, by a vote of five to one, the jury found Graphnet did not prove, by a preponderance of the evidence, that it suffered actual damages as a result of a statement made by Retarus. Furthermore, by a vote of six to zero, the jury found that Graphnet was not entitled to any compensatory or actual damages. Finally, on the question of nominal damages, the following occurred:

> THE COURT: What is the amount of nominal damages Graphnet is entitled to compensate Graphnet for the injury to reputation which you reasonably believe it sustained?
>
> And is there an amount?
>
> JURY FOREPERSON: Yes.
>
> THE COURT: And what is that amount?

10

JURY FOREPERSON: $800,000.

THE COURT: Okay and . . . what was the vote on that?

JURY FOREPERSON: 6-0.

Defendant filed a motion for remittitur or, alternatively, a new trial limited to a determination of nominal damages. Plaintiff opposed defendant's motion and the matter came for oral argument before the trial judge on March 29, 2019. In an order dated May 8, 2019, the trial judge granted defendant's motion for remittitur, and reduced the jury's $800,000 nominal damages award to $500. The judge found that "the award of $800,000 was grossly disproportionate to the purpose of 'nominal damages.'"

In support of her decision, the judge quoted the Supreme Court's holding in W.J.A. v. D.A, that "[n]ominal damages are 'awarded for the infraction of a legal right, where the extent of the loss is not shown, or where the right is one not dependent upon loss or damage.'" 210 N.J. 229, 240-41 (2012), (internal citation omitted). With respect to her decision to award plaintiff $500 as nominal damages, the judge relied on the definition of "nominal damages" in the Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -17, which defines "nominal damages" as "damages that are not designed to compensate a plaintiff and are less than $500." N.J.S.A. 2A:15-5.10.

11

Except for the obligation to defer to the trial judge's "feel of the case," we review a trial judge's decision to grant a motion for remittitur de novo. Cuevas, 226 N.J. 510. The "feel of the case" exception is based on the trial judge's unique position to see jurors "wince, weep, snicker, avert their eyes, or shake their heads in disbelief." Id. at 501, (quoting Jastram v. Kruse, 197 N.J. 216, 230 (2008)). However,

> the "feel of the case" does not give the trial judge the right to "overthrow the jury's credibility determinations and findings of fact and then substitute her own. Ultimately, the jury's "feel of the case" controls the outcome of the issues in dispute. A judge's "feel of the case" based on observing a party or a witness in the courtroom is entitled to minimal weight if the jury had the same opportunity to make similar observations.
>
> [Cuevas, 226 N.J. at 502, (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 600 (1977)).]

A court has the power to grant a motion for remittitur only when a jury's damages award is so grossly excessive "that it shocks the judicial conscience." Orientale v. Jennings, 239 N.J. 569, 593 (2019) (quoting Cuevas, 226 N.J. at 485). Relying on this well-settled standard, we agree with the trial judge's decision to set aside the jury's "nominal damages" award of $800,000. Such a figure not only shocks our collective judicial conscience, it is utterly irreconcilable from any notion of "nominal" and not supported by the evidence

12

presented at trial. Nominal damages include damages which may be presumed, and "serve the purpose of vindicating the character of 'a plaintiff who has not proved a compensable loss.'" Nuwave Inv. Corp. v. Hyman Beck & Co., Inc., 221 N.J. 495, 499 (2015) (internal citation omitted). Nominal damages "are not to be awarded as compensation and are not appropriate when compensatory damages are otherwise available to the plaintiff." Id. at 500.

However, as we made clear at the start of this opinion, the dispositive error the trial judge committed here is not based on the method she used to determine the excessiveness of the jury's damages award. The judge's order imposing $500 as nominal damages over plaintiff's objection violated the Court's holding in Cuevas requiring plaintiff's consent. 226 N.J. at 499. The record shows plaintiff affirmatively opposed the trial judge's order. This refutes defendant's argument that plaintiff waived its right to consent. See R. 4:35-1(c); R. 1:8-1(b).

Finally, we note for future reference that the Supreme Court's holding in Orientale included the following clarification of this important area of our common law jurisprudence:

> The acceptance of a remittitur or an additur is optional to both parties. The absence of mutual consent means that the case proceeds to a second jury for a new damages trial. Although the party objecting to the court's grant of a new trial may appeal that decision, no appeal may be filed from the court's setting of the

remittitur or additur amount. The parties have the power simply to reject the amount fixed by the court if they disagree with the court's assessment.

[239 N.J. at 595.]

Affirmed in part, reversed in part, and remanded for a new trial on nominal damages only.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION