**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4067-17

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ALLEN D. REED, a/k/a
JULIUS REED, JUNIE
REED, ALAN REED,
and ANDRE SNYDER,

    Defendant-Appellant.

_____

Argued January 5, 2021 – Decided February 8, 2021

Before Judges Yannotti and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-08-2194.

Susan L. Romeo, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Susan L. Romeo, of counsel and on the brief).

Jason Magid, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent

(Jill S. Mayer, Acting Camden County Prosecutor, attorney; Jason Magid, of counsel and on the brief).

PER CURIAM

Defendant was tried before a jury and found guilty of first-degree murder and other offenses. Defendant appeals from the judgment of conviction (JOC) dated March 20, 2018. We affirm.

I.

Defendant was charged under Camden County Indictment No. 16-08-2194, with first-degree murder of Edwin Davis, N.J.S.A. 2C:11-3(a)(1) (count one); first-degree robbery, N.J.S.A. 2C:15-1(a)(1)-(2) (count two); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count three); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count four); possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count five); fourth-degree unlawful possession of hollow-nose or dum-dum bullets, N.J.S.A. 2C:39-3(f)(1) (count six); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count seven).

At defendant's trial, evidence was presented showing that in May 2016, Davis was residing with his three children, his fiancé Celeste Russell, and Russell's three children at a home on Morgan Boulevard in Camden. Davis was employed by the Bellmawr highway department. On May 3, 3016, Davis awoke

2

at around 5:30 a.m. to go to work. Russell heard him go downstairs a few minutes after 6:00 a.m. At around 7:00 a.m., a neighbor found Davis's body in the backyard of Davis's home. He had been shot one time in the chest, suffered massive blood loss, and died.

Russell testified that Davis was a drug dealer who sold pills to persons who would come to their house. She stated that the night before the shooting, Davis received calls from several individuals he was supposed to meet the next day. She also said, that before he left for work on the morning of May 3, 2016, he took approximately $1,100 from their dresser and put it in his front pocket.

After the neighbor found Davis's body, Detective Mark Lee of the Camden County Police Department reviewed surveillance footage he obtained from the Crestbury Apartment complex, which is located across the street from the row houses where Davis had his home. Lee reviewed the footage at the office of a nearby apartment complex with the same ownership as Crestbury Apartments.

The surveillance footage showed that at 4:45 a.m. on May 3, 2016, a minivan was on Olive Street, which is across from the row houses on Morgan Boulevard, where Davis's home was located. An individual wearing dark clothes is seen exiting the minivan and the vehicle then drove away turning left

A-4067-17

onto Morgan Boulevard. The individual walked in the same direction and crossed the street towards the row houses on Morgan Boulevard.

While he was at the complex reviewing the footage, Lee looked out a window and noticed the same minivan drive by. Lee and a partner located the vehicle and, around 11:00 a.m., they conducted a motor vehicle stop. The vehicle was a beige Chrysler minivan, which was being driven by its registered owner, Syia Strong. Defendant was a passenger in the front-seat of the van.

Strong lived in an apartment nearby with Rashawn Braxton and her four children. She had been dating defendant for about four months, and approximately two weeks before the shooting, defendant had moved into the master bedroom of her apartment. The officers detained Strong and defendant and transported them to the Camden County Prosecutor's Office.

Detective Sutley and another detective questioned Strong and defendant separately. They informed Strong of her Miranda rights,[1] following which she waived her rights and provided a statement. Initially, Strong did not tell the detectives anything regarding the events of earlier that morning. However, after Detective Sutley accused her of being an accomplice to Davis's murder, she told them defendant was responsible for Davis's death.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-4067-17

Defendant was tried on the first six counts of the indictment. At the trial, Strong testified that at around 3:00 a.m. or 4:00 a.m. on the morning of May 3, 2016, she and defendant were "having some drinks" with a friend when defendant asked her to drive him to a friend's apartment in the Crestbury Apartment complex, which was less than a ten-minute drive from Strong's apartment. According to Strong, defendant was wearing dark clothing, including black pants and a black shirt. Strong said it was raining at the time.

Strong dropped defendant off in the middle of Olive Street, next to the Crestbury complex, then returned home to go to sleep. Strong said that around 6:10 a.m., she was awakened by a phone call from defendant who asked her to pick him up where she had dropped him off. Strong drove to Olive Street but defendant was not there.

Strong then pulled to the side of the road on Maple Walk, just off Olive Street, where her daughter had an apartment. She called defendant to let him know she had arrived. Defendant eventually appeared and entered the van. Strong said defendant was wearing the same dark clothing he had been wearing when she dropped him off, and that he was wet from the rain.

When they got out of the van at Strong's apartment, defendant told Strong he "had to shoot somebody." She asked him "who and why," and defendant told

5

her he shot Davis. He said that when he told Davis to get on the ground, Davis had rushed at him. Strong started to cry and went upstairs to her apartment to tell Braxton. Defendant went into the master bedroom and got into bed.

Later, Strong was getting ready to leave to bring the children to school, drop Braxton off at work, and run certain errands. Strong went to the master bedroom and asked defendant if he was coming with her, and he said he would accompany her. She noted that defendant had changed his clothes and hung his wet clothes on the closet door. She said they all left the apartment together.

At some point, Strong's daughter-in-law called Strong to let her know that someone in her apartment complex, Everett Gardens, was selling a bedroom set. Strong decided to purchase the furniture. She stated that she and defendant went to pick up the furniture but were not able to get it all in the minivan in one trip. On the second trip, the police stopped Strong and defendant and took them into custody.

Following their interview with Strong, Sutley and another detective interviewed defendant. During the interview, defendant stated that he wanted to speak with an attorney. The officers terminated the interview and transferred defendant to the Camden County Police Administration Building (CCPAB). Thereafter, the police executed a search warrant at Strong's and defendant's

6

apartment. They seized a dark, "moist knit hat[,] . . . a set of moist gloves," a pair of pants, a sweatshirt, and a silver and black Smith & Wesson revolver.

The detectives interviewed Braxton and Strong, and after the interviews, they met with the assistant prosecutor who authorized the officers to charge defendant with felony murder. Sutler prepared a warrant detailing the charges and went back to the CCPAB to advise defendant of the charges against him.

The detectives transported defendant from his holding cell to an interview room with recording capabilities and advised defendant of the charges against him. When Sutley read the part of the complaint that charged defendant with purposely causing Davis's death, defendant stated, "[w]ho the hell is Edwin Davis?"

Sutley told defendant that because he had invoked his right to an attorney, he could not answer any questions or have any discussion with him. Defendant then said that he wanted to ask questions without an attorney. Sutley told him that for defendant's own protection and for the protection of the investigating officers, he would read the defendant his Miranda rights again, and if he decided to waive those rights, they could discuss the matter.

Sutley read defendant the Miranda warnings. Defendant acknowledged each right and then waived them both verbally and in writing. Sutley asked

defendant if he was sure he wanted to change his mind and speak without an attorney, and defendant indicated he was sure. Defendant then had a lengthy conversation with the detectives.

Defendant acknowledged that Strong had dropped him off near the Crestbury apartments at around 2:00 or 3:00 a.m. on the morning of May 3, 2016, but said he was there to visit the home of the mother of his children. Defendant told the detectives no one answered the door when he knocked so he sat outside under a porch overhang for approximately three hours.

Defendant also said that at one point he walked to Strong's daughter's apartment in the Crestbury apartment complex. He told the detectives he hoped to see Strong because she sometimes drove her daughter to work in the morning. He said no one answered the door there either. Defendant stated while he was sitting on the porch outside the apartment in the Crestbury complex, he heard a single gunshot in the direction of a park on Morgan Boulevard.

Defendant first told the detectives that he did not see anyone around the time of the gunshot. However, defendant later stated that while he was sitting on the porch in the Crestbury complex after the gunshot, he saw a dark figure run by but did not know which direction that individual ran. He said he just saw

A-4067-17

the person in "dark clothing shoot by there." He said Strong picked him up about twenty minutes after he heard the gunshot.

At one point, defendant was shown a picture of Davis. He said he knew him as "E," a drug dealer he met several times when Strong brought him with her to buy pills from Davis. The detectives asked defendant about his involvement in Davis's death, but defendant denied having any involvement in the shooting or knowledge about the weapon and clothes recovered at the apartment.

Defendant said he did not know anything about the Smith & Wesson gun. He also stated that he did not own a hoodie and he had not been wearing one on of the day of the shooting. Instead, defendant told the detectives the only things hanging on the closet doors in his room were his robe and a towel. He said that when he went to the Crestbury complex, he was wearing the same clothes he was wearing when he was arrested. He stated that he did not get wet, despite the heavy rain because he stayed under the overhang.

The jury found defendant guilty on counts one through six, and the State then agreed to dismiss count seven. The judge later granted the State's motion for imposition of an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a). The judge found aggravating factors three (risk defendant will

commit another offense), six (extent of defendant's criminal record and the seriousness of the offenses of which he has been convicted), and nine (need to deter defendant and others from violating the law) were applicable. N.J.S.A. 2C:44-1(a)(3), (6), and (9). The judge found no mitigating factors applied.

The judge merged counts three (felony murder) and five (possession of a weapon for an unlawful purpose) with count one (murder) and sentenced defendant on count one to life imprisonment with a period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.[2] On count two (robbery), the judge sentenced defendant to a concurrent term of twenty years of incarceration, with an eighty-five percent period of parole ineligibility under NERA.

The judge also imposed a concurrent prison term of ten years, with three-and-one-half years of parole ineligibility, on count four (unlawful possession of a weapon), and a concurrent term of eighteen months on count six (possession of hollow point or dum-dum bullets). The judge filed a JOC dated March 20, 2018. This appeal followed. On appeal, defendant argues:

---

[2] NERA provides in pertinent part that "[s]olely for the purpose of calculating the minimum term of parole ineligibility pursuant to [N.J.S.A. 2C:43-7.2(a)], a sentence of life imprisonment shall be deemed to be 75 years." N.J.S.A. 2C:43-7.2(b). Thus, defendant's period of parole ineligibility is sixty-three years, nine months.

A-4067-17

POINT I
THE COURT'S INSTRUCTION THAT THE JURY COULD NOT REMOVE THE SUSPECT'S SIZE "LARGE" CLOTHING OR DEFENDANT'S SNEAKERS FROM THE SEALED BROWN PAPER EVIDENCE BAGS TO EXAMINE THEM WAS PLAIN ERROR[] BECAUSE IT INTERFERED WITH THE JURY'S DELIBERATIVE PROCESS, VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO PRESENT A COMPLETE DEFENSE, AND VIOLATED THE COURT RULES (not raised below).

POINT II
DEFENDANT'S CONVICTION MUST BE REVERSED BECAUSE THE TRIAL COURT ERRONEOUSLY DENIED DEFENDANT'S MOTION TO SUPPRESS THE POLICE STATEMENT THAT HE GAVE AFTER HE HAD INVOKED HIS RIGHT TO COUNSEL, WHEN THE POLICE REINITIATED THE INTERROGATION WITHOUT COUNSEL'S PRESENCE (U.S. CONST. AMENDS. V and XIV).

POINT III
DEFENDANT'S SENTENCE MUST BE REVERSED AND THE MATTER REMANDED FOR RESENTENCING BECAUSE THE COURT PROVIDED NO SUPPORT FOR ITS IMPOSITION OF THE MAXIMUM SENTENCE OF LIFE IMPRISONMENT FOR THE MURDER THAT OCCURRED DURING THE ROBBERY.

II.

We first consider defendant's contention that the trial judge erred by denying the jury's request to inspect the jeans, hooded sweatshirt, and sneakers

11

that he had allegedly been wearing during the murder. Defendant argues, for the first time on appeal, that the judge's ruling and her instruction to the jury interfered with the jury's deliberative process, violated his constitutional right to present a complete defense, and was inconsistent with the court rules.

The trial court's duty during a criminal trial is "to assure that the jury is able properly to discharge its most important responsibility . . . determining guilt or innocence." State v. Simon, 79 N.J. 191, 206 (1979) (citing State v. Jackson, 43 N.J. 148 (1964); Panko v. Flintkote Co., 7 N.J. 55 (1951)). Ensuring that the jury's deliberations are "based solely upon the evidence in accordance with proper and adequate instructions, is at the core of the guarantee of a fair trial." Ibid. (citing State v. Butler, 27 N.J. 560, 594-98 (1958); State v. Costa, 11 N.J. 239, 249 (1953)).

Our court rules generally permit members of the jury to "take into the jury room the exhibits received in evidence." R. 1:8-8. Trial courts are, however, vested with broad discretion regarding jury requests to bring physical evidence into the jury room during deliberations. See State v. Pemberthy, 224 N.J. Super. 280, 302 (App. Div. 1988) (holding that the decision whether or not to allow a bag of cocaine into the jury room is within the court's discretion), certif. denied, 111 N.J. 533 (1998); Fiorino v. Sears Roebuck & Co., 309 N.J. Super. 556, 567-

12

69 (App. Div. 1998) (holding that with a proper instruction, the trial judge has the discretion to allow the jury to inspect evidence in the jury room during deliberations).

Here, the trial judge did not abuse her discretion or undermine the integrity of the jury's deliberative process by denying the jury's request to inspect the jeans, hooded sweatshirt, and sneakers during the deliberations. The record shows that the State had admitted sealed bags into evidence, with testimony from Detective Gurcik indicating that the bags contained the jeans, hooded sweatshirt, and sneakers that the police had seized when they executed the search warrant at Strong's and defendant's apartment.

Detective Gurcik also identified photographs of the jeans, hooded sweatshirt, and sneakers. He testified that the photographs accurately depicted the clothing and sneakers at the time they were seized, and the photos were admitted into evidence. During his testimony, Detective Gurcik did not remove the items from the sealed evidence bags, and during cross-examination, defense counsel did not ask him to do so.

During deliberations, the jury asked to inspect the jeans, hooded sweatshirt, and sneakers. The trial judge determined that the sealed bags should not be opened during deliberations because the bags had not been opened during

13

trial testimony.  Defense counsel did not object to the court's ruling.  Indeed, counsel agreed the evidence bags should not be opened.

On appeal, defendant contends the clothing itself became the crucial evidence by which the jurors could test the State's allegations and Strong's credibility.  Defendant contends Strong had lied to protect Braxton, who is six feet, two inches tall, and weighs two-hundred pounds.  He contends that denying inspection of the evidence violated his right to present a complete defense.  We disagree.

We are convinced the judge did not abuse her discretion by denying the jury's request to examine the jeans, sweatshirt, and sneakers.  As the judge noted, the evidence bags were admitted into evidence, and the bags were not opened during the evidence portion of the trial.

The judge's ruling did not deny defendant of his constitutional right to present a complete defense.  One of the hallmark constitutional guarantees for criminal defendants is the assurance that they will have "a meaningful opportunity to present a complete defense."  Crane v. Kentucky, 476 U.S. 683, 690 (1986); State v. Smith, 224 N.J. 36, 48 (2016).

The jury was able to evaluate the credibility of Strong and other witnesses by using the photographs of the jeans, hooded sweatshirt, and sneakers that were

14

admitted into evidence, along with the detailed physical descriptions of the clothing presented by witnesses during the trial. Defendant was not denied a "meaningful opportunity to present a complete defense." Crane, 476 U.S. at 690; Smith, 224 N.J. at 48.

Defendant further argues that the judge's response to the jury's request violated "the spirit and purpose" of Rule 1:8-8. As noted, the Rule permits the jury to take into the jury room the exhibits "received in evidence." R. 1:8-8. Here, the trial court correctly recognized that the evidence bags had been admitted into evidence, but not the contents of those bags. The judge's ruling was entirely consistent with plain language of Rule 1:8-8, as well as the "spirit and purpose" of the Rule.

We are also convinced that even if the judge erred by denying the jury's request to inspect the jeans, sweatshirt, and sneakers, the error does not rise to the level of plain error, which is an error "clearly capable of producing an unjust result." R. 2:10-2. "The error must have been of sufficient magnitude to raise a reasonable doubt as to whether it led the jury to a result it would otherwise not have reached." State v. Weston, 222 N.J. 277, 294 (2015).

Here, the State presented substantial evidence of defendant's guilt, which includes Strong's testimony about the clothes defendant was wearing when she

15                                                                    A-4067-17

drove him to the Crestbury apartments on the night Davis was killed, and testimony by Detective Gurcik describing the clothing and sneakers seized from defendant's room, along with photos of those items. We are not convinced that the denial of the jury's request to inspect the jeans, sweatshirt, and sneakers led the jury to a result they would not otherwise have reached, based on the evidence presented at trial.

In view of our decision, we need not address defendant's contention that the invited error doctrine does not apply or preclude him from challenging the judge's ruling regarding the jeans, sweatshirt, and sneakers on appeal.

### III.

Defendant further argues that the trial judge erred by denying his motion to suppress the statement he gave to the police after he invoked his right to counsel. He contends the police violated his right to counsel because they initiated further interrogation of defendant without the presence of his attorney.

"Appellate review of a motion judge's factual findings in a suppression hearing is highly deferential." State v. Gonzales, 227 N.J. 77, 101 (2016) (citing State v. Hubbard, 222 N.J. 249, 262 (2015)). We must "uphold the motion judge's factual findings so long as sufficient credible evidence in the record supports those findings." Ibid. (citing State v. Elders, 192 N.J. 224, 243-44

(2007)).  However, a trial court's interpretation of the law does not receive any special deference and is reviewed de novo.  State v. Gamble, 218 N.J. 412, 425 (2014) (citing State v. Gandhi, 201 N.J. 161, 176 (2010); Manalapan Realty v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

A suspect who invokes his right to counsel during a custodial interrogation is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).  See also State v. Alston, 204 N.J. 614, 620 (2011) (noting that after a suspect has requested counsel, an interrogation may not continue until the suspect is provided with counsel or "the suspect initiates further communication sufficient to waive the right to counsel.").

A suspect is considered to have initiated further communication if he invites "discussion of the crimes for which he was being held."  State v. Chew, 150 N.J. 30, 64 (1997) (quoting State v. Fuller, 118 N.J. 75, 82 (1990)).  The State must establish that it was the accused, rather than the police, who initiated any further questioning after the accused has invoked his right to counsel.  State v. Wright, 97 N.J. 113, 122-23 (1984).  However, "[i]f an accused does initiate a conversation after invoking his rights, that conversation may be admissible if

the initiation constitutes a knowing, intelligent, and voluntary waiver of the accused's rights." Chew, 150 N.J. at 61 (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).

"The term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." State v. Hubbard, 222 N.J. 249, 267 (2015) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Innis, 446 U.S. at 301.

Here, the record shows that defendant invoked his right to counsel, the interrogation ended, and he was moved to the CCPAB. Thereafter, the police executed the warrant to search Strong's and defendant's apartment. Following the search, the prosecutor's office authorized the police to charge defendant with offenses related to Davis's death, and Sutley prepared a complaint. Defendant then was returned to an interview room at the prosecutor's office, where Sutley advised him of the charges.

A-4067-17

While Sutley was reading the complaint to defendant, defendant began to ask questions about the investigation. Sutley informed defendant he could not answer any of defendant's questions or discuss the investigation because defendant had invoked his right to an attorney. Defendant then stated that he wanted to ask questions without an attorney.

Sutley again read defendant the Miranda warnings. Defendant acknowledged each right individually and then waived his rights both verbally and in writing. Sutley again asked defendant if he was sure he wanted to change his mind and speak without an attorney. Defendant again indicated that he wanted to proceed without an attorney.

We are convinced the judge did not err by holding that defendant initiated the further discussion with the investigating detectives and voluntarily waived his right to counsel. When the detectives advised defendant of the charges, they were not engaging in custodial interrogation. Moreover, nothing Sutley said to defendant could be interpreted as intending to "elicit an incriminating response from" defendant. Hubbard, 222 N.J. at 267.

Instead, by asking questions regarding the investigation, defendant himself "[i]nvited discussion of the crimes for which he was being held." Chew, 150 N.J. at 65. The judge noted that even though the police are not required to

19

re-administer <u>Miranda</u> warnings in this situation, Sutley followed the "prudent" approach and again informed defendant of his <u>Miranda</u> rights. <u>Ibid.</u> The judge also found that defendant clearly understood his rights, and that his waiver of his rights was knowing and voluntary. The record supports the judge's findings.

IV.

Defendant further argues that his sentence is excessive. He contends we should remand the matter for resentencing because the trial judge failed to provide sufficient reasons for imposing the maximum sentence for murder.

We review the trial court's sentencing determinations "in accordance with a deferential standard." <u>State v. Fuentes</u>, 217 N.J. 57, 70 (2014). "The reviewing court must not substitute its judgment for that of the sentencing court." <u>Ibid.</u> (citing <u>State v. O'Donnell</u>, 117 N.J. 210, 215 (1989)). Therefore, we

> must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [<u>Ibid.</u> (quoting <u>State v. Roth</u>, 95 N.J. 334, 364-65 (1984)).]

Here, the judge granted the State's motion for imposition of an extended term pursuant to N.J.S.A. 2C:43-7. The judge then found aggravating factors three ("risk that the defendant will commit another offense"), six ("extent of the defendant's prior criminal record and the seriousness of the offenses of which he had been convicted"), and nine ("need for deterring the defendant and others from violating the law") applied. N.J.S.A. 2C:44-1(a)(3), (6), (9).

The judge noted that defendant "has an extensive criminal history," including a history of domestic violence, as well as violations of his probation and an escape from prison. Defendant also "maxed out of his last prison sentence . . . and committed this crime less than six months later." The judge found that defendant had "shown a complete disregard for the rules of our society and the rules of the Department of Corrections, and these are all signs of a risk to reoffend."

Regarding aggravating factor six, the judge noted that defendant had been previously convicted of "drug offenses, property offenses, offenses against law enforcement, escape and domestic violence offense[s]." The judge stated that defendant was a persistent offender with an extensive criminal history spanning decades, and therefore gave considerable weight to aggravating factor six.

A-4067-17

In addition, the judge stated that "it appears nothing deters this defendant from violating the law. He killed Edwin Davis for no apparent reason. He was on the street for less than six months when he committed this crime." The judge stated that defendant "is a threat to the safety of the public and to law enforcement," and gave great weight to factor nine.

The judge then considered each of the thirteen mitigating factors and found that none applied to defendant. The judge found that the aggravating factors substantially outweighed the non-existing mitigating factors and sentenced defendant on count one (murder) to life imprisonment, with a period of parole ineligibility as prescribed by NERA. As noted previously, the judge merged certain offenses and imposed concurrent sentences on other counts.

On appeal, defendant argues that the judge failed to articulate any circumstances that support the imposition of a life sentence. We disagree. As we have explained, the judge thoroughly reviewed the aggravating factors and found no mitigating factors applied. The judge provided ample reasons for imposing a life sentence. The judge followed the sentencing guidelines, and there is sufficient evidence in the record to support the judge's findings. Defendant's sentence does not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4067-17